FARMERS' LOAN & TRUST CO., Trustee, *v.* CHICAGO & A. RY. CO. and others.[1]

*(Circuit Court, D. Indiana.　April 8, 1886.)*

1. TRUST—DEATH OF TRUSTEE DOES NOT INVALIDATE TRUST.
    A trust, valid at its inception, is never permitted to fail for lack of a trustee; *e, g.,* a conveyance in trust to two, one capable of taking and one not, will not become invalid by reason of the death of the competent trustee.
2. SAME—CITIZEN OF NATION HAS RIGHT TO HOLD PROPERTY UPON TRUST IN ANY STATE.
    A citizen of the United States has the right to hold real and personal property, absolutely, or in trust for his own benefit, or in trust for the benefit of himself and others, in any state of the Union. So held *arguendo.*
3. SAME—STATE STATUTE CONFINING TRUSTEES TO RESIDENTS, VOID AS TO CITIZENS OF THE UNITED STATES.
    A state statute which declares a conveyance in trust of real or personal property to a non-resident, except by will, invalid, is void as to citizens of the United States, as inconsistent with the constitution, art. 4, § 2, cl. 1, which

[1] Reported by Russell H. Curtis, Esq., of the Chicago bar.

provides that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." So held *arguendo*.

4. SAME—FOREIGN CORPORATION—STATE STATUTE CONFINING TRUSTEES TO RESIDENTS DOES NOT AFFECT SUCH CORPORATION.

A state statute which declares a conveyance in trust of real or personal property to other than "a *bona fide* resident" of the state invalid, and which provides that a trustee's right shall cease upon his removal from the state, *held*, in view of surrounding facts, not to govern a conveyance in trust to a foreign corporation of property within the state.

5. SAME—CONSTRUCTION OF TRUST DEED—RIGHT TO FORECLOSE NOT BARRED.

Provisions in a trust deed made by a railway corporation to secure its bondholders, which prohibit the trustee, without the consent of the holders of a majority of the bonds, to declare the principal due before maturity, to take possession of the mortgaged property, operate, or sell it, or to maintain a foreclosure suit for the principal before the maturity of the bonds, do not abrogate the right of the trustee, at the request of a single bondholder, or the right of a single bondholder himself, if the trustee refuses to act, to foreclose, upon breach of the condition of the deed by the corporation's failure to pay interest.

6. RAILROADS—MORTGAGE—FORECLOSURE FOR INTEREST DUE—FORM OF DECREE.

In a suit by a trustee suing for the benefit of bondholders to foreclose a trust deed against a railway corporation to enforce the payment of overdue interest, complainant, unless restrained by the trust deed, is entitled to a decree *nisi* for the amount due and for a sale of the mortgaged property upon default in payment. Upon payment of the amount due, the foreclosure decree will be suspended until default again occurs in the payment of interest.

7. RECEIVER—HIS APPOINTMENT DISCRETIONARY.

The appointment of a receiver rests in the sound discretion of the court. Defendant's insolvency may or may not be cause for appointing receiver.

In Equity.

*B. H. Bristow, J. E. McDonald, H. B. Turner,* and *C. N. Steele,* for complainant.

*J. H. Choate, J. J. McCook, Charles L. Atterbury, Edward Daniels, C. W. Fairbanks,* and *Jacob S. Slick,* for defendants.

GRESHAM, J. The Chicago & Atlantic Railway Company, on the thirteenth of June, 1881, by its deed of trust, conveyed to the Farmers' Loan & Trust Company, a New York corporation, and Conrad Baker, a resident and citizen of Indiana, its line of railway extending from Marion, Ohio, to Chicago, together with all other property of every character which it then owned or might thereafter acquire, to secure an issue of 6,500 bonds of $1,000 each, payable on November 1, 1920, with interest at 6 per cent. per annum, payable semi-annually on the first days of May and November. On the fifteenth day of September, 1883, the railway company, by a second trust deed, conveyed the same property to the Farmers' Loan & Trust Company and George J. Bippus, a citizen of Indiana, to secure an additional issue of 5,000 bonds of $1,000 each, payable on the first day of August, 1923, with interest at the rate of 6 per cent. per annum, payable semi-annually on the first days of February and August. This suit is brought by the Farmers' Loan & Trust Company against the Chicago & Atlantic Railway Company and George J. Bippus, the co-trustee in the second mortgage; Conrad Baker, the co-trustee in the first mortgage, being dead.

Section 2988 of the Revised Statutes of Indiana, which was in force when the trust deeds were executed, provides that "it shall be unlawful for any person, association, or corporation to nominate or appoint any person a trustee in any deed, mortgage, or other instrument in writing, (except wills,) for any purpose whatever, who shall not be at the time a *bona fide* resident of the state of Indiana; and it shall be unlawful for any person who is not a *bona fide* resident of the state to act as such trustee. And if any person, after his appointment as such trustee, shall remove from the state, then his rights, powers, and duties as such trustee shall cease, and the proper court shall appoint his successor, pursuant to the act to which this is supplemental."

It is urged that inasmuch as the Farmers' Loan & Trust Company is a New York corporation it was not capable, under this statute, of acting as trustee in the trust deed or mortgage, and that it cannot, therefore, maintain this suit. The Chicago & Atlantic Company conveyed its property in trust to secure its bonds, and it would not, perhaps, as between itself and the bondholders, be permitted to urge this objection against the validity of its own solemn act. Gov. Baker, the co-trustee, who died before the suit was brought, and whose successor in the trust has not been appointed, was a resident of Indiana when the trust deed was executed. This satisfied the requirements of the Indiana statute. No court would be expected to hold that the trust deed was void because one of the trustees was not a resident of Indiana. If it be true that the Farmers' Loan & Trust Company was not capable of acting as trustee to the extent of taking title to so much of the mortgaged property as was situated within the state, or that its designation as trustee was to that extent inoperative and void, nevertheless the trust deed was valid when executed, and a trust is never permitted to fail for want of a trustee. The trust property was conveyed as an entirety to secure the payment of the bonds and coupons, and it is not claimed that the Farmers' Loan & Trust Company was incapable of acting as trustee so far as the trust embraced property within the states of Ohio and Illinois. Suits between the same parties, asking the same relief, commonly called "ancillary" suits, may be, and presumably have been, instituted in the circuit court of the United States for the Northern district of Ohio and the Northern district of Illinois, and the court in either of those jurisdictions would have authority to decree a sale of the mortgaged property as an entirety. *Muller* v. *Dows*, 94 U. S. 444.

If, under such circumstances, a court of equity has authority to allow the requesting coupon-holders to be made co-complainants with the Farmers' Loan & Trust Company, it would be expected to exercise it instead of dismissing the bill. The facts of this case would perhaps justify the exercise of that authority. But if the Chicago & Atlantic Company be not estopped from denying that the Farmers' Loan & Trust Company was capable of acting as trustee, and if the court is not

authorized to allow the coupon-holders, at whose request the suit was brought, to be substituted as complainants or made co-complainants with the Farmers' Loan & Trust Company, the bill must be dismissed, unless the statute relied on is invalid.

It will be observed that this statute does not prohibit foreign corporations from doing business in this state. Obviously that was not the design of the legislature. It is a statute which denies to residents of other states the right to take and hold in trust, otherwise than by last will and testament, real and personal property in Indiana. The right is asserted to deny to persons, associations, or corporations, within or without the state, power to convey to any person in trust, not a resident of Indiana, real or personal property within the state. This is a plain discrimination against the residents of other states. If Indiana may disqualify a resident of another state from acting as trustee in a trust deed or mortgage which conveys real or personal property as security for a debt due to himself alone, or for debts due himself and other creditors, it would seem that the state might prohibit citizens of other states from holding property within the state, and to that extent from doing business within the state. No state can do the latter. A person may, and frequently does, acquire a property interest by a conveyance to him in trust. A citizen of the United States cannot be denied the right to take and hold absolutely real or personal property in any state of the Union, nor can he be denied the right to accept the conveyance of such property in trust for his sole benefit, or for the benefit of himself and others. This right is incident to national citizenship.

Section 2 of article 4 of the constitution of the United States declares that "the citizens of each state shall be entitled to all the privileges and immunities of citizens in the several states." "Attempt will not be made," say the supreme court of the United States in *Ward* v. *Maryland,* 12 Wall. 418, "to define the words ' privileges and immunities,' or to specify the rights which they are intended to secure and protect, beyond what may be necessary to the decision of the case before the court. Beyond doubt, those words are words of very comprehensive meaning; but it will be sufficient to say that the clause plainly and unmistakably secures and protects the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful commerce, trade, or business, without molestation; to acquire personal property; *to take and hold real estate.* * * *"

But it may be said that the word "person," as used in the statute, includes artificial as well as natural persons, and that the statute is capable of enforcement as against corporations only. A careful reading of the act will show that it is not capable of such construction. The latter clause of the section says: "If any person, after his appointment as such trustee, shall remove from the state, his right as trustee shall cease." A domestic corporation cannot remove from

the state; and if the words "a foreign corporation" be read into the statute, they are qualified by the words "*bona fide* resident," and it is plain that a foreign corporation cannot become a "*bona fide* resident" of a state which does not create it. A corporation is a mere creation of local law, having no legal existence beyond the sovereignty where created. It dwells in the place of its creation and cannot migrate. *Paul* v. *Virginia*, 8 Wall. 168. How, then, can a corporation of another state become a *bona fide* resident of Indiana? It is true that the existence of a corporation may be and frequently is recognized abroad by the enforcement of its contracts made abroad as well as at the place of its domicile, and in other ways; but that is done purely upon considerations of comity.

In March, 1879, a statute was enacted by the legislature of Indiana, which declared that if any foreign corporation brought a suit in the federal courts for the district of Indiana, or removed a suit pending in a court of the state to such federal courts, it should thereby forfeit its right to transact business in the state, and be prohibited from thereafter transacting any business therein. The passage of this act sufficiently accounts for the phraseology of the statute relied on in this suit. Having gone as far as the legislature deemed it necessary to go in the enactment of the statute of March, 1879, it was doubtless thought unnecessary to make this act, which was passed two months later, apply to foreign corporations as well as natural persons. In enacting the latter statute, the legislature no doubt deemed the former one sufficient to deter any person, association, or corporation from appointing a foreign corporation to act as trustee in any deed or mortgage, and that additional legislation was necessary only to prevent the appointment or designation of natural persons to act as such trustees. The Farmers' Loan & Trust Company was therefore capable of accepting the conveyance as trustee, and of acting as such, notwithstanding the state statute.

In the resolution of the board of directors which authorized the issuance of the bonds, and the execution of the trust deed or mortgage to secure them, it was declared that the security should be for the payment of both principal and interest, and it was directed that proper provisions should be inserted in the trust deed or mortgage to secure to the holders of the bonds payment of principal and interest according to their tenor. It was declared in the trust deed or mortgage that it should be a security for the payment of the bonds, with the interest maturing thereon ratably, and without discrimination, according to their tenor and effect; that the trustees should hold the property so conveyed to them for the benefit, security, and protection of persons and corporations, firms and partnerships, who should hold the bonds and interest warrants, or any of them, and for the purpose of enforcing the payment thereof; that until default should be made in any portion of the interest or principal of the bonds, or any of them, or in any other requirement, the railroad

company should continue in possession, control, and management of the mortgaged property, with the right to receive and use the tolls, income, and profits therefrom; that upon default in the payment of the interest or principal of any of the bonds, and such default continuing for six months after maturity and demand of payment, at the request in writing of the holders of at least a majority of the bonds then owing and outstanding, the trustees might and should take possession of the mortgaged property, and operate the same until the net receipts or earnings should enable them to pay the overdue interest, after which possession of the mortgaged property should be restored to the railroad company: provided, however, that if the holders of at least a majority of the outstanding bonds should elect and notify the trustees in writing, before the interest in default should be paid, that they (the bondholders) desired the principal of the outstanding bonds to become due, then, in that event, the trustees, instead of surrendering the mortgaged property to the railroad company, should retain possession of the same, and apply the earnings, and any surplus which might remain in their hands, to the satisfaction of the interest and principal of the outstanding bonds ratably, and without discrimination or preference, and the trustees should operate and manage the railroad until the outstanding bonds and interest should be paid in full. It was further declared in the trust deed that in case of default in the payment of the interest and principal of any of the bonds, either by their terms or under the conditions above stated, it should be lawful for the trustees, after entry, or without entry, upon the written request of at least a majority of the holders of the bonds then outstanding, to sell and dispose of the mortgaged premises.

Article 4 of the trust deed reads as follows:

"The party of the first part covenants and agrees to and with the party of the second part, and their successors in said trust, and to and with each person or persons who shall or may become holder or holders of any of the said bonds, their heirs, executors, administrators, and assigns, jointly and severally, that in case of default in the payment of the interest or principal of any of said bonds, and such default continuing for the space of six months after maturity and demand of payment, and the principal of said bonds shall have become due, either by the terms thereof or at the election of the bondholders as aforesaid; or in case of default in the performance of any of the other covenants or conditions herein contained on the part of the party of the first part, and such default continuing for the space of six months after notice is given in writing by the parties of the second part, or their successors in said trust, or by a holder of any of said bonds, to perform the same,—then, at the request in writing of the holders of at least a majority of the bonds then owing and outstanding, the parties of the second part, or their successors in said trust, after entry as aforesaid, or without entry, may or shall foreclose the equity of redemption of the party of the first part, and of all other persons having any legal or equitable rights or claims against or in or to the mortgaged premises, or any part or portion thereof, by proceedings at law, or in equity, in any court of competent jurisdiction, whether of the states through which the said road may run or of the United States; and it is

hereby expressly understood and agreed that upon proper indemnity to the trustees a majority in interest of the holders of the bonds secured hereby shall, from time to time, have a right to direct and control the proceedings for the foreclosure of this mortgage."

The Chicago & Atlantic Company has paid no interest on either class of bonds. The Erie Company paid out $584,850 in taking up first mortgage coupons, which became due prior to November 1, 1884. All the interest that became due under the first mortgage on and subsequent to the last-named date remains unpaid. Including the coupons taken up by the Erie Company, the interest due on the first mortgage bonds is $1,669,850. The coupons which became due on November 1, 1884, and May 1, 1885, had remained unpaid for six months after maturity and demand before this suit was brought. It was brought at the request of the owners of past-due coupons, after payment had been demanded and refused, and against the wish and protest of the holders of a majority of the bonds, who in open court moved that the suit be dismissed.

It is contended that no action can be taken by the trustees looking to the forclosure of the mortgage or the appointment of a receiver without the written request or direction of the holders of at least a majority of the bonds, such consent or request being the basis of all action for the enforcement of the trust; and that no right of action exists or can exist in favor of any one to enforce the lien of the mortgage for interest only. Under the provisions of the trust deed, without the direction or consent of the holders of a majority of the bonds the trustee cannot take possession of the mortgaged property, or declare the principle due before maturity, according to the terms of the bonds, nor without such consent can the trustee operate or sell the property, or commence proceedings to forclose the principal before maturity, in 1920. It does not follow, however, that because this power is given to the holder of a majority of the bonds that the trustee, at the request of a minority, or even of a single bondholder, may not commence proceedings to forclose for the non-payment of interest; or if, on proper demand, the trustee refuses to bring suit, that a minority, or even a single bondholder, may not sue. Failure to pay a single installment of interest is a breach of the conditions of the trust deed.

The Chicago & Atlantic Company agreed to pay interest on each bond, and it conveyed its property to trustees "for the benefit, security, and protection of the persons and corporations, firms, and partnerships who should hold the bonds and interest warrants aforesaid, or any of them, for the purpose of enforcing payment thereof according to their tenor and effect." The power of a majority to control proceedings to foreclose for the payment of principal when it shall become due, at the election of a majority, before maturity in 1920, is not exclusive of the right which a single bondholder has to enforce the security for the non-payment of any installment of interest on

any bond.   This right of a minority, or even a single bondholder, does not depend upon the consent of a majority.   If it did, the company might refuse to pay interest on the bonds held by a minority until maturity according to their terms, and even after that time, if some of the counsel for the defendant are correct in their position that neither before nor after maturity can the trust be enforced without the consent of at least a majority.   The right which is asserted by the majority must be found in plain and explicit terms in the mortgage or it will not be recognized.   It cannot exist by mere implication.

It is true that in article 4 of the mortgage it is declared "that, upon indemnity to the trustees, a majority in interest of the holders of the bonds secured hereby shall, from time to time, have a right to control the proceedings for a foreclosure of this mortgage." The proceedings here referred to are the proceedings to enforce the trust for the payment of principal which shall become due, under the provisions of the mortgage, at the election of the holders of a majority of the bonds before maturity according to their terms.   The right is given to control *the* proceedings for a foreclosure, not *all* proceedings for a foreclosure.

*Chicago, D. & V. R. Co.* v. *Fosdick*, 106 U. S. 47, S. C. 1 Sup. Ct. Rep. 10, was a suit to foreclose a mortgage or trust deed executed by the railroad company to secure both principal and interest of an issue of bonds.   The mortgage provided that if any interest should be permitted to continue in default after presentment and demand of payment, the trustees might declare the principal of all the bonds immediately due and payable, and notify the company thereof; and that, upon the written request of the holders of a majority of the bonds, the trustees should proceed to collect the principal and interest of all the bonds by foreclosure and sale, or otherwise, as provided in the mortgage.   There was default in the payment of coupons that fell due on October 1, 1873, but a majority of the bondholders thereafter funded these coupons; the coupons not funded, however, continuing unpaid for more than six months.   The circuit court decreed that the entire debt, both principal and interest, was due, and ordered the mortgaged property sold unless payment should be made within 20 days.   It was held, Justice MATTHEWS delivering the opinion of the court, that although the principal of the bonds was not shown to be due, it plainly appeared that interest upon a minority of them was in default; that the record failed to show that any of the coupons not afterwards funded had been presented and payment thereof refused; and that a written request from a majority of the holders of the bonds to the trustees was necessary to authorize them to declare the principal due, and institute proceedings for its collection, and no such request appeared.   In speaking of the right to maintain the suit for non-payment of interest, the court said:

"But inasmuch as by the terms of the first article the conveyance was declared to be for the purpose of securing the payment of the interest as well as the principal of the bonds, and by the fourth article the mortgagor's right of possession terminated upon a default in the payment of interest as well as the principal of any of the bonds, we are of opinion that, independently of the provisions of the other articles, the trustees, or, on their failure to do so, any bondholder, on non-payment of any installment of interest on any bond, might file a bill for the enforcement of the security by the foreclosure of the mortgage and sale of the mortgaged property. This right belongs to each bondholder separately, and its exercise is not dependent upon the co-operation or consent of any of the others or any of the trustees. It is properly and strictly enforceable by and in the name of the latter, but, if necessary, may be prosecuted without, and even against, them. It follows from the nature of the security, and arises upon its face, unless restrained by its terms."

The complainant is entitled to a decree *nisi*, ascertaining the amount due upon the coupons which are not held by the resisting bondholders, and if the amount, when ascertained, is not paid within a reasonable time, to be fixed by the court, the complainant, for the benefit of those whom it represents in this suit, will be entitled to a decree for the sale of the mortgaged property, barring all rights subordinate to the mortgage. The demurrer to the bill is overruled.

The motion for the appointment of a receiver remains to be determined.

The Erie road extended from New York to Salamanca, and the New York, Pennsylvania & Ohio road, which had been leased by the Erie Company, extended from the latter place to Marion, Ohio. Hugh J. Jewett was then president of the Erie Company, and he, and others associated with him, realizing the importance to that company of owning or controlling a through line from the city of New York to Chicago, which would enable the Erie Company to compete with other through lines for western business, caused the Chicago & Atlantic Company to be organized, and its road built. The road of the latter company was built to be operated as a part of the Erie line, and in the interest of that company. About the time the first mortgage was executed the Erie Company, the Chicago & Atlantic Company, and other companies, as well as certain individuals, entered into contracts providing for the construction and operation of the new road as the western extension of the Erie line; for the negotiation of the first mortgage bonds; and for advancements to be made by the Erie Company to pay the interest on those bonds; and for other purposes. The Erie Company agreed that it would advance money to complete the road should the proceeds of the bonds and the subsidies collected prove inadequate for that purpose; that it would advance money to pay interest accruing on the bonds previous to the completion of the road; and that "from its own gross earnings derived from all business passing from and to the Chicago & Atlantic Company, to the extent of such gross earnings received during the fiscal year in which any installment of interest on the bonds shall

fall due, make good any deficiency in the net earnings of the Chicago & Atlantic necessary for the payment of such installment of interest on said first mortgage bonds." The Chicago & Atlantic Company agreed that it would, after paying interest on its first mortgage bonds out of its gross earnings, reimburse the Erie Company out of such gross earnings for advancements made by that company to complete the new road, and to pay interest on the first mortgage bonds, and that the Erie Company should have a lien on the net earnings for such advancements in the order named. Besides what was realized from the sale of the first mortgage bonds and subsidies,—the latter amount being inconsiderable,—the Erie Company advanced all the money that was used in the construction of the Chicago & Atlantic's road, and all interest which is not in default has been paid by that company. It was also agreed that the Chicago & Atlantic Company should deliver to the Erie Company at Marion, all freight and passengers which it could control, destined to points reached by the Erie Company, and in return that the latter company should deliver to the Chicago & Atlantic Company, so far as it could control the same, an amount of west-bound traffic which should bear to the whole amount of the Erie Company's west-bound traffic for Chicago and points beyond the same proportion that the amount of east-bound traffic received by it from the Chicago & Atlantic Company would bear to the whole amount of the Erie Company's east-bound traffic. It was also agreed that Hugh J. Jewett should hold 90 per centum of the capital stock of the Chicago & Atlantic Company, as trustee, with irrevocable power to vote the same until all moneys advanced by the Erie Company to the Chicago & Atlantic Company should be repaid, and until the principal and interest of the first mortgage bonds should be fully paid.

The Chicago & Atlantic Company was never able to pay operating expenses and interest on its bonds. Being in want of money and embarrassed, that company, in July, 1883, entered into a further agreement with the Erie Company. By this agreement it was provided that the latter company should make additional advances to the Chicago & Atlantic Company, which should make a second mortgage upon its property and franchises to secure an additional issue of bonds amounting to $5,000,000, to be placed in the hands of Mr. Jewett, as trustee, to be held as collateral security for advances of money made, and to be made, with authority, as such trustee, to pledge or sell the bonds. The bonds and mortgage were executed. Prior to this time the Erie Company had advanced to the Chicago & Atlantic Company more than $1,500,000, and the Erie Company claims to have made further advances after the second mortgage bonds were placed in Mr. Jewett's hands as trustee. Mr. Jewett borrowed $1,500,-000 from Grant & Ward, which the Erie Company received and credited upon the account of the Chicago & Atlantic Company. This loan was secured by a deposit by Mr. Jewett of $2,500,000 of the second

mortgage bonds.    Notes made payable to Grant & Ward by the Chicago & Atlantic Company, and indorsed by the Erie Company, amounting to $1,500,000, were delivered to Grant & Ward at the same time. It was the understanding, however, between Grant & Ward and the two companies that these notes were to be held and used as memorandum notes, and not otherwise.    Before failing in May, 1884, Grant & Ward pledged both the notes and the bonds to various banks and individuals as collateral security for loans, the pledgees being ignorant of the arrangement under which Grant & Ward received the notes and bonds.    The Chicago & Atlantic Company failed to take up any of these notes or bonds, and in order to protect its credit as indorser the Erie Company was obliged to pay over a million dollars on the notes, and in doing so it obtained possession of 761 of the second mortgage bonds.    It follows that to the extent that the Erie Company took up the notes which it had indorsed, the indebtedness of the Chicago & Atlantic Company was not reduced.

Since Mr. Jewett ceased to be president of the Erie Company he has claimed that the stock of the Chicago & Atlantic Company was deposited with him, not as president of the Erie Company, but as a personal trust, and he now insists that he has the irrevocable right, as such trustee, to vote the stock, and thereby maintain control of the Chicago & Atlantic Company, without regard to the wishes of the Erie Company.    The holders of the first mortgage bonds, who claim the right to control these proceedings, are acting in concert with Mr. Jewett.

The facts abundantly show that he was made trustee to hold the stock of the Chicago & Atlantic Company, with authority to vote it, because he was president of the Erie Company, and could be relied upon to control and manage the Chicago & Atlantic road as the western extension of the Erie line.    If the Erie Company was expected to advance money to complete the construction of the new road, and to pay interest on the bonds, and thus take care of the credit of the Chicago & Atlantic Company, it was not unreasonable it should, in some way, be protected against unfriendly management of the new road.    The Erie Company's stockholders and creditors no doubt thought the placing of the stock in Mr. Jewett's hands would afford them ample protection.    It was provided in the contract which designated Mr. Jewett as trustee, that in the event of his death or resignation, the trust should devolve upon such person as he might have previously designated to succeed him, and in default of such designation that the trust should devolve upon such person as the Erie Company might designate.

This language plainly indicates that Mr. Jewett was authorized to act as trustee, with power to vote the stock, because he was president of the Erie Company, and as such would see to it that the Chicago & Atlantic road was operated as a part of the Erie line.    His present position as to his powers and duties as trustee are inconsist-

ent with the views which he entertained while president of the Erie Company. In his annual report to the stockholders of that company in 1882 he said:

"To secure the construction of the road, and its future management to the satisfaction of the parties proposing to purchase the bonds, it was agreed that the entire proceeds thereof, together with certain subsidies which had been voted by the townships along the line, should be deposited with the president of the New York, Lake Erie & Western Railroad Company, in trust, and the duty was devolved upon him of seeing to the proper application thereof to the construction of the road. It was further stipulated that ninety per cent. of the stock should also be deposited with him, with irrevocable proxy to vote thereon during the life of the bonds, (thirty years from the date thereof,) thereby securing to your company the absolute control of the road for such period. * * * By this means your company secures access to the business and markets of Chicago by a line of road as much under its control as though it had advanced all the money needed for its construction, and assumed all the obligations incident to its maintenance and operation."

Mr. Jewett now says that the stock was not deposited with him, as president of the Erie Company, with irrevocable power to vote the same as such president during the life of the bonds, and that it was not the intention that the Erie Company should thereby secure the absolute control of the new road for that period.

The court cannot be expected, at this stage of the litigation, to pass upon the validity of the contracts already referred to, or to determine the rights, duties, and liabilities of the parties thereto. Although the two companies are natural allies, and their roads should be operated as a single line, there is little hope of harmonious action until a change occurs in the management of one or both. Each accuses the other of violating contract obligations. Mr. Jewett controls the action of the Chicago & Atlantic Company, and that he is unfriendly and even hostile to the Erie Company, under its present management, admits of no doubt. It is claimed by him, and the holders of a large majority of the bonds who are acting in concert with him, that, without any change in the Chicago & Atlantic Company's management, the Erie Company should be required to pay the interest accrued and to accrue on the first mortgage bonds. The Erie Company appears to have advanced to the Chicago & Atlantic Company, from time to time, over $2,000,000, the main consideration for which was the agreement that the latter's road should be operated as the western extension of the Erie line, and the only security that was given for these large advances was the pledge of the second mortgage bonds. The facts thus far brought to the attention of the court do not justify the assertion that since Mr. Jewitt ceased to be president of the Erie Company its violations of the traffic contract have reduced the earnings of the Chicago & Atlantic Company equal in amount to the latter's indebtedness to the former. The Chicago & Atlantic road was first operated for through business three years ago. It is not denied that it failed to pay operating expenses the first and second years. The

statements submitted show, however, that during the third year its earnings exceeded its operating expenses by $58,127, which sum was not sufficient to pay the amount remaining due on operating expenses for the first and second years. Exclusive of the 761 second mortgage bonds which the Erie Company acquired, as above stated, the principal of the outstanding bonds amounts to over $8,000,000. The interest which is due on the first mortgage bonds, including the coupons taken up by the Erie Company, amounts to $1,169,850, and all the interest which has accrued upon the second mortgage bonds is unpaid, the interest now due on both classes of bonds being more than $1,500,000. It is not denied that while Mr. Jewett was president of both companies, the money advanced by the Erie Company to the Chicago & Atlantic Company amounted to more than $1,500,000, and the former claims, with apparent foundation, that after the execution of the second mortgage it advanced $700,000 more.

But without reference to the fact that the Erie Company is vitally interested in the solvency of the Chicago & Atlantic Company, and whether the latter is indebted to the former or not, the owners of bonds amounting to $105,000, secured by the first mortgage, are entitled to their interest; and it is no answer to the motion which the trustee has made in their behalf for the appointment of a receiver that the Erie Company has not kept faith with the Chicago & Atlantic Company. Mr. Jewett has either been unwilling or unable to establish business relations with any other trunk line, and the facts do not justify the hope that he can operate his road without some change in its relations, and pay operating expenses and interest on its bonds. In fact, the Chicago & Atlantic Company is badly embarrassed, and probably insolvent. It may be that a change in management would improve its condition, and enable it to produce an income, after paying operating expenses, sufficient to pay its debts, and interest on such of its bonds as are not held by the majority of the holders who are united with Mr. Jewett in resisting this suit and motion. But, in any event, the owners of the past due coupons are entitled to payment, and it may become necessary for the court to take possession of the mortgaged property, and operate it through a receiver, for their benefit. The physical condition of the mortgaged property is good, and taxes and labor and supply claims are not in arrears.

The appointmant of a receiver rests in the sound discretion of the court; mere insolvency may or may not call for such action. A ruling on the motion for the appointment of a receiver is deferred.