# MANUEL BRANCA *v.* J. K. MAKUAKANE, E. W. BARNARD and KAHAAWIOLA.

EXCEPTIONS FROM CIRCUIT COURT, FOURTH CIRCUIT.

SUBMITTED JUNE 25, 1901.              DECIDED JULY 30, 1901.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

The word "heirs" was not essential to convey a fee simple in a deed executed prior to the enactment of the statute which adopted the common law.

That statute did not affect titles which had vested prior to its enactment.

OPINION OF THE COURT BY FREAR, C.J.

This action to quiet title was tried by the court, jury waived, and judgment rendered for the defendants. It comes here on the plaintiff's exceptions.

The only question presented is whether a certain deed in the Hawaiian language conveyed a life estate only or a fee simple, the word "heirs" not being used.

The granting words are, "ke hana nei au, haawi, kuai a ma keia ke hoolilo loa nei au i ku'u apana aina apau loa," &c., and the habendum is, "ia W. Kealoha i oleloia no ka manawa pau ole." A translation of these words is on file as follows: "do give, grant, sell and by these presents convey all of my piece of land," &c., and, to have and to hold, &c., "unto the said W. Kealoha forever."

This language, the Hawaiian even more than the English, shows beyond doubt an intention to convey a fee simple. The question is whether the technical rule of the common law which usually required the use of the word "heirs," and allowed no substitute therefor, however clear the intention might be, to carry an estate in fee simple, should be allowed to override the manifest intention of the parties.

The deed was executed August 2, 1886, and is to be construed by the law then in force. The statutory provision (Civ. L. Sec. 1109) which took effect January 1, 1893, adopting the common law except in certain cases, would not affect a title which had vested previously. Whether this deed if executed after the statute took effect would not come within one of the exceptions named in the statute, need not be decided.

In our opinion the common law rule requiring the use of the word "heirs" was not law here in 1886.

That rule was a relic of the feudal system and grew up under conditions that no longer exist in England and never existed in these islands as it did in England. It is now regarded as purely technical, and its chief effect seems to be to defeat the intention of the parties. Accordingly it has been modified or repealed by statute in England, the home of its origin, and in nearly all of the States and Territories of the United States. Certain exceptions to it have always been recognized even in the absence of statutory provision. For instance, it does not apply to conveyances by fine or recovery, to creations of nobility by writ, to deeds to corporations, whether sole or aggregate (not even the word "successors" being required in the case of a corporation aggregate), to grants to a king or to a sovereignty, to a release by way of extinguishment, or to partitions between joint tenants, coparceners or tenants in common. The following are other exceptions of greater significance. Courts of equity go so far in giving effect to the intention of the parties as to enforce contracts to convey in fee even though the contract to convey does not contain the word "heirs." They also hold that conveyances in trust carry estates as large as the purposes of the

trust require whether there are words of inheritance or not. In devises by will it is everywhere held that the clear intention of the devisor to give an estate in fee will be given effect whether the word "heirs" is used or not. This exception seems to have been adopted because at the time when devises came to be allowed, the rigor of the feudal law had begun to wear away, and the courts saw that if they adhered to the old rule of strictness in cases of wills great injustice would be done, as most people were unfamiliar with the technicalities of the law and were unable to get legal advice when they wanted to make their wills. In *Feoffees of Grammar School v. Andrews*, 8 Metc. 584, 592, the Supreme Judicial Court of Massachusetts held for somewhat similar reasons that the word "heirs" was unnecessary in an early grant in that State. The court said: "In construing conveyances made early after the settlement of the country, when conveyancing was little understood, the intention of the parties is to govern, without regarding rigid rules of construction which would be applicable to recent conveyances, and which might defeat the intention of the parties, however clearly that might be made to appear. So it was decided in *Adams v. Frothingham*, 3 Mass. 352. And the same rule of construction was adopted in *Springfield v. Miller*, 12 Mass. 415, and has been recognized in other cases. This rule of construing ancient conveyances was adopted to uphold the titles derived therefrom, which otherwise might be subverted in very many instances, and would be attended with manifest injustice, so extensively as to require, for the public good, the adoption of a rule adapted to the transactions which took place soon after the first settlement of the country. Conforming to this rule of construction, we can have no doubt that, by the grant in question an estate in fee passed to the grantees. That a fee was intended to be conveyed, will not admit of a doubt." In *Cole v. Lake Company*, 54 N. H. 242, the Supreme Court of New Hampshire held that a fee might be conveyed without the use of the word "heirs," saying, among other things:

"It is said to be a rule of the common law, that without the word 'heirs' a fee-simple in land cannot pass by deed; and that this rule is so absolute and unyielding, that, no matter how clearly the intention of the grantor to convey a fee may be stated in the deed, such intention can be of no avail without that word. Washb. R. P. Bk. I, ch. III, sec. 53, and authorities in notes. *A priori* we should expect to find a rule which in its practical application brings about results so anomalous and absurd, but which is nevertheless, enforced with such remorseless rigor by the courts, upheld by reasons very plain and very imperative. Naturally we should also expect that the books, which are full of cases where its application has produced palpable injustice, more or less aggravated according to circumstances, would also be filled with strong and conclusive reasons in its support. On the contrary, what does appear? I venture to affirm that since the revolution by which the house of Stuart was finally excluded from the British throne, when most of the shackles which feudalism had riveted upon the tenure of lands throughout the kingdom were removed, not a reason, nor the semblance of a reason, growing out of the condition and wants of society, the progress of civilization, the exigencies of trade, or the analogies of the law, can be found in its support in any country or state where the common law has been used." P. 279.

"They who brought the general body of the common law with them to this region might well have omitted to bring the feudal rule, not because it was fabricated in a barbaric age, but because it was designed and fitted to perpetuate a barbaric condition; not because it originated in a foreign land, but because it was not suited to the commonwealth which our foreign ancestors came to this country to organize; not because, as a part of the military system of Europe, it was less necessary in feudal times than other compulsory methods of filling armies and navies in other times, but because the general feudal relation of lord and vassal not being an incident of New Hampshire civilization, and the particular debt of personal service due from the vassal to the lord (which the heirs of the vassal might be incompetent to perform) not being a universal consideration of the conveyance of New Hampshire real estate, the feudal rule (requiring the word 'heirs' as evidence of the lord's intention to assume the risk of his vassal's heirs being incapable of the stipulated service) was inapplicable to the situation and circumstances of the emigrants, and implied a servitude inconsistent

with the principles of personal freedom and equality which pervaded their social and political plan, hostile to the general object of their emigration, and particularly subversive of that absolute ownership of the soil which they specially sought in the New World.

"It appears that in Massachusetts, prior to 1651, the word 'heir' was 'oftentimes omitted when an estate of inheritance is intended to be passed by the parties. * * * The word must have been omitted as often proportionally here as in Massachusetts.'" Pp. 286, 287.

The court further said, referring to remarks made by Lord Mansfield in regard to the exception to the rule in the case of wills:

"He did not explain by what authority the court has laid hold of the generality of other expressions in a will to take the devise out of this rule, or how it would be possible in that way to give effect to the intention of the testator without shaking a rule of law by the conjecture of a private imagination, *provided it is a rule of law* that the word 'heirs' is indispensable to the passing of a fee. Nor did he do what would have been more useful still, that is to say, point out the reason for a distinction in this respect between the construction of a will and a deed. The reason for not applying the rule to wills is sensible and easily understood. It is, as Lord Coke expresses it *quod ultima voluntas testatoris est perimplenda secundum veram intentionem suam.* Coke Litt. 322, *b.* But this shows no reason for the distinction. It does not show why the intention of the maker of the instrument is any more sacred in one case than in the other, nor by what right the court can abrogate the rule in favor of one class of donees, if it must be rigidly enforced against the other. If for any reason, however mysterious, a fee in land could not pass without the use of this potent word, all efforts of the court to bring about such a result where the word was wanting, whether in a will or deed, must have failed. But in the case of wills those efforts did not fail. What, then, became of the feudal rule? It yielded to reason. It was swept away by the monstrous absurdity and injustice which its application must involve. It could not stand, because no enlightened court could uphold it, and in so doing defeat the manifest intention of the donor, without feeling that they were ministers of arbitrary oppression and wrong rather than of law. For

obvious reasons the same question as to defeating the intention of the grantor in a deed seldom comes up. But when it does arise, how can that intention be defeated without involving a violation of common right and common sense, equally glaring and flagrant? Where is the reason for upholding the rule as to deeds, and rescinding it as to wills? By what right can the courts say that the intention of a testator plainly written in his will shall govern, but the intention of a grantor as plainly written in a deed of bargain and sale shall be set at naught, the consideration of the sale be disregarded, and the property be thrust back upon the grantor or his heirs, on the death of the grantee, for the want of this feudal word of inheritance?

"In the nature of things the word is no more necessary to the valid conveyance of land than to the valid conveyance of a horse. Its use was necessary in the scheme of a semi-barbarous institution, a vast engine of slavery and oppression, an instrument of violence and disorder, which had no better security for its continued existence than superiority of brute force, and which was swept away upon the dawn of a better civilization more than five hundred years ago. Why is its use still required in one class of instruments and not in the other, where both have the same object in view, namely, the conveyance of land?

"I have not found any answer to this inquiry.   *   *   *

"Our conclusion is, that the rule, which would defeat the obvious intention and destroy the plainly expressed contract of the parties in the present case, is not adapted to our institutions or the condition of things in this state; that it never became part of the law of the state, and, therefore, that this instrument conveys to the lessees a perpetual right to take and use the water upon the terms and conditions specified, which right may pass to their heirs and assigns as a fee." Pp. 289, 290.

See on this general subject 2 Cooley's Blackstone, 107 *et seq.* and notes; 4 Kent, Com. 6 *et seq.*; 1 Jones, Real Prop. Sec. 575 *et seq.*, Sec. 593 *et seq.*, and notes; 1 Dembitz, Land Tit., Sec. 15 and notes; *Lathrop v. Wood*, 1 Haw. 121.

The New Englanders who early settled here did not come as a colony or take possession of these islands or bring their body of laws with them, though they exercised a potent influence upon the growth of law and government. The ancient laws of the Hawaiians were gradually displaced, modified and added to.

The common law was not formally adopted until 1893 and then subject to judicial precedents and Hawaiian national usage. Prior to that time·the courts were at first without statutory suggestion as to what law they should follow in the absence of statutes, and later were expressly permitted by statute to appeal to "natural law and reason, or to received usage, and * * * the laws and usages of other countries" and "to adopt the reasonings and principles of the admiralty, maritime, and common law of other countries, and also of the Roman or civil law, so far as * * * founded in justice, and not in conflict with the laws and customs" of this country. See Civ. Code, Secs. 14, 823. The courts usually followed the common law when applicable. But they felt free to reject it, and did as a rule when, as in the present case, it was based on conditions that no longer exist, and when it had come to be generally recognized as merely technical and subversive of justice or the intentions of the parties to instruments and when it had in consequence been generally altered or abrogated by statute elsewhere. The question here, unlike that in the United States, was not whether the court should decline to follow a rule, but whether it should adopt a rule. The reason for giving effect to the clear expressed intention and for not adopting technical rules, especially when they are practically obsolete and founded on conditions that never existed here, is greater in the case of Hawaiians and Hawaiian deeds than in the case of English speaking people and English deeds. See *Haalelea v. Montgomery*, 2 Haw. 62; *Kekuke v. Keliiaa*, 5 *Ib.* 437. Among the cases in which the court has declined to follow the common law as to real property the following may be mentioned: *Wood v. Ladd*, 1 *Ib.* 17, seal not essential to a mortgage; *Campbell v. Manu*, 4 *Ib.* 459, seal not essential to a deed; (see also *In re Congdon*, 6 *Ib.* 633, seal not essential to a bond); *In the matter of Vida*, 1 *Ib.* 63, dower in leasehold estate of long duration; *Kuuku v. Kawainui*, 4 *Ib.* 515, *Puukaiakea v. Hiaa*, 5 *Ib.* 484, and *Kuuku v. Kawainui*, 4 *Ib.* 515, conveyance of freehold *in futuro;* (see also *Judd v. Hooper*, 1 *Ib.* 13, livery of

seisin); *Awa v. Horner*, 5 *Ib.* 543, deed to two or more creates tenancy in common; *Thurston v. Allen*, 8 *Ib.* 392, same as to tenancy in common, also Rule in Shelley's Case not law here; *In re Keliiahonui*, 9 *Ib.* 6, *Mossman v. Government*, 10 *Ib.* 421 and *Ninia v. Wilder*, 12 *Ib.* 104, conveyance by disseissee valid; *Rooke v. Queen's Hospital*, 12 *Ib.* 374, estates tail and fees simple conditional cannot exist here. See also *Kake v. Horton,,* 2 *Ib.* 209, damages for death by wrongful act; (see also *Puuku v. Kaleleku*, 8 *Ib.* 80); also *The King v. Agnee*, 3 *Ib.* 106, and *The King v. Robertson*, 6 *Ib.* 718, practice in criminal cases. It is unnecessary to quote from these cases. Much of the reasoning contained in them is applicable to the present case.

The use of the word "heirs" to indicate an intention to convey an estate of inheritance is to be commended, for it is a well established and appropriate mode of indicating such an intention, but to hold that the failure to use it should defeat such an intention when clearly expressed in some other way would work great injustice. In our opinion the rule which allowed no substitute for that word to express such an intention was not in force here at the date of the deed in question and the trial Judge erred in holding that only a life estate was conveyed by the deed.

The exceptions are sustained, the judgment is vacated and the case remanded to the Circuit Court for such further proceedings as to law and justice shall appertain.

*A. S. Hartwell* and *E. A. Mott-Smith* for the plaintiff.

*Wise & Nickeus* for the defendants.