In re the Guardianship of ANNA T. K. PARKER.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

SUBMITTED JUNE 27, 1902.            DECIDED JULY 25, 1902.

GALBRAITH AND PERRY, JJ., AND W. AUSTIN WHITING, ESQ., OF THE BAR, IN PLACE OF FREAR, C.J., DISQUALIFIED.

Guardians or trustees in this Territory are not restricted in the investment of trust funds, to public securities or real estate mortgages.
Investment of trust funds in the bonds of private industrial corpora-

tions may be made where such bonds are amply secured by mortgage deed of trust on real estate and personal property and are regarded with favor by prudent men seeking investment of their own funds.

The condition in a trust deed securing bonds requiring the assent of a majority of the bond-holders to compel the trustees to proceed to foreclose for default in the payment of interest on the bonds does not in the absence of express stipulation in the deed take from the minority or single bond-holder the right to pursue the usual remedies in a court of equity.

This majority consent clause is not a delegation of authority by a trustee who buys such bond.

A purchase of bonds by a guardian of a minor from a corporation of which he is the treasurer and a director is voidable at the election of the *cestui que trust.*

OPINION OF THE COURT BY GALBRAITH, J.

This appeal is from the decree of a Circuit Judge of the First Circuit Court surcharging a guardian with the amount of certain investments of the ward's funds as shown by his annual account.

It appears that the ward, Anna T. K. Parker, is now eight years old and that the value of her personal property and annual income was found by the Master to be in the neighborhood of $300,000, that the second annual account of her guardian, Alfred W. Carter, filed November 15, 1901, shows loans and investments in the sum of $54,250.00; that this account discloses certain investments in the bonds of local industrial corporations as follows: 27 bonds of the McBryde Sugar Co., Ltd., $26,960, and 4 bonds of the Waialua Agricultural Co., Ltd., $4,050, and 2 bonds of The Oahu Railroad & Land Co., Ltd., $1,500, total of $32,510.00; that the account was referred to a Master who later reported recommending that the same be approved as filed; that the court referred the account back to the Master with instructions to take testimony and to make further investigation into the character of the security for the several bonds in which

the guardian had invested the funds; that after taking testimony the Master filed a supplemental report in which he recites that "the property of the Waialua plantation appears to be worth about $3,500,000 and to be good security for a loan of $1,000,-000," and that "the property of the McBryde plantation appears to be worth not less than $2,000,000 and to be good security for a loan of $750,000," and that the bonds in both cases are secured by first mortgage deeds of trust; that the issue of bonds in the first company was for one million dollars and in the latter for seven hundred and fifty thousand dollars; that the court refused to approve the Master's report and caused additional testimony to be adduced whereupon the Court found the accounts to be "correct and in order except in one particular, namely, in respect to the investment of the sum of $27,000 in bonds of the Mc-Bryde Sugar Company, Limited," and approved the accounts in all respects except as to the bond investments; these were disapproved and the guardian was surcharged with the amount of the investment ($32,510), also with interest thereon at the rate of six per centum per annum from the date of the respective investments; that neither before the Master nor before the Court was any testimony adduced as to the security for the Oahu Railway and Land Company's bonds except the admission that they were secured by deed of trust in form similar to that securing the plantation bonds; that from this order the guardian appealed and to represent the ward pending the appeal the Court appointed a guardian *ad litem.*

The decision of the Court below was based upon two grounds, namely, (a) that the common law rule forbidding the investment of trust funds in any securities except real estate mortgages and public bonds was in force in this Territory, and (b) that on account of the form of the trust deed the guardian in making the investment violated the rule forbidding a trustee to delegate his authority, also the rule forbidding the mingling of trust funds.

Much was said at the argument and in the brief in this Court on collateral subjects. We cannot be expected to speculate or calculate the probabilities or chances, under certain supposed or

fancied conditions, of disaster or misfortune overtaking certain industrial enterprises of this community or to speculate on the motives that would prompt men to certain action under certain fancied conditions. All these might be interesting and instructive themes for the philosopher, publicist or moralist, but they are not in issue on this appeal and we do not care to announce a dictum upon any one of them. Is the common law rule relied on by the Court below in force in this Territory? It is admitted that there is no statute in this Territory restricting the investment of trust funds. The common law of England was not formally adopted in these islands until 1893 and then only so far as it was not contrary to "judicial precedents and Hawaiian national usage." Prior to that time the courts of these islands were free to adopt or reject the rules of the common law. *Branca v. Makuakane*, 13 Haw. 499, 505.

It does not appear from any of the reported decisions of this Court that the rule of the common law relied on has ever been adopted in these islands. It does appear that the rule has been specifically denied and that in a contested case the court refused to adopt or follow the rule, *In re Estate of Banning*, 9 Haw. 453, 461, 462, and announced the more liberal rule of a number of the states as follows, "No statutory provision limiting the investment of trust funds to specific securities existed in the Hawaiian Islands, and this Court cannot go further than to hold that the trustee must act with honesty, prudence, faithfulness, and exercise a sound discretion in placing trust funds for investment." p. 462.

It is contended that the decision in the Banning case is not binding authority for the reason that it was rendered prior to the annexation of the Hawaiian Islands to the United States and that none of the decisions of this Court rendered before annexation are controlling except those construing statutes continued in force by the Organic Act or such as may have become rules of property.

This is not the view that this Court as now constituted has taken of those decisions. Nor is it the view of the United States

District Court for the Territory or the United States Circuit Court of appeals for the Ninth Circuit.   (See *The Schooner Robert Lewers Company v. Kamaka Kekauoha*, 114 Fed. 849).   It was held by the former court, in the case last cited at *nisi prius* and by the latter court on appeal that a decision of the Supreme Court of the islands rendered in 1860, contrary to the common law, (sustaining an action by the widow for damages for the death of her husband, no such action could be maintained at common law,) was a part of the law of the Territory of Hawaii. What the court of appeal said in that case is pertinent here.

"As will have been observed, the Supreme Court there expressly declared: 'The principle which we now recognize will become, by judicial adoption, a valuable part of the common law of this kingdom.'  Such judicial modification of the common law the legislature of Hawaii has expressly sanctioned and ratified by section 1109 of Ballou's compilation of the laws of that country, which, as has been seen, was in turn sanctioned and ratified by section 1 of the Act of Congress of April 30, 1900, above set out.   There was therefore statutory authority for the right asserted and sustained by the court below."  *Id.* p. 854.

The rule in regard to the investment of trust funds as announced in the Banning case has been the law of this jurisdiction on that subject since the date of the decision, (April 25th, 1894) and will continue such until overruled by this Court or until a different rule is made by legislative enactment.

Much unpleasant criticism has been made of the decision in the Banning case.   We are inclined to think that the greater part at least of this is unwarranted.   The doctrine there announced is not new nor is it novel.   It has been the law in some of the states for half a century and has been approved by the Supreme Court of the United States.   Mr. Justice Gray in speaking for that court said:   "The general rule is everywhere recognized, that a guardian or trustee, when investing property in his hands, is bound to act honestly and faithfully, and to exercise a sound discretion, such as men of ordinary prudence and intelligence use in their own affairs.   In some jurisdictions no attempt has been made to establish a more definite rule; in others, the

discretion has been confined, by the legislature or the courts, within strict limits." *Lamar v. Micou*, 112 U. S. 452, 465.

In this opinion the decisions of the Supreme Courts of the several states and the rule announced therein up to that date (1884) are reviewed. From this it appears that the rule announced in the Banning case is followed in Massachusetts, Rhode Island, New Hampshire, Vermont, Maryland and Georgia.

We do not share the fear expressed by counsel for the dire disasters that are predicted to threaten wards and their estates unless the investment of their funds is restricted to public securities and real estate mortgages. The rule of the Banning case has been the law of this jurisdiction for at least eight years. The practical working of the rule for this period has not verified the predictions of evil made against its operation. If trust funds have been dissipated and lost by reason of this rule our notice has not been called to specific instances.

In view of these facts and the absence of any government securities in this jurisdiction for the investment of trust funds and the general commercial, industrial and agricultural conditions prevailing here we do not realize that there is any pressing necessity for a change of the rule.

One of the investments approved in the Banning case was in bonds of the Kahuku plantation and another was in the bonds of the Oahu Railway and Land Company—the last being the same bonds that were disapproved by the court below in this case. The question was not raised in the Banning case as to the form of the trust deed nor was it discussed by court or counsel. From the fact that it appears in this case that the trust deed securing the Oahu Railway and Land Company bonds contains the same provision as the plantation bonds we assume that there was the same form of trust deed in that case as this. The McBryde bonds, and the others are in like form, recite that they are "first mortgage coupon bonds" and are payable to bearer, in United States Gold Coin at the office of the company, Honolulu, on July 1st, 1910," "and bear interest at the rate of 6% payable semi-annually and that they are secured by a mortgage deed of trust

covering the property of the plantation real and personal.   They are in the form of negotiable security as are the coupons attached thereto.   The trust deed recites the authority and purpose for its execution, the form and number of the bonds and coupons, the name of the three trustees and the certificate to be endorsed on the bonds by the trustees, and conveys to the trustees the property of the plantation set out in detail and recites the pur‧ pose of the conveyance to be "for the security and benefit of the holders of the bonds above mentioned and herein secured to be paid, and also for the like interest and benefit of all others inter‧ ested in said bonds or the property to be hereby conveyed" and that the grantor—the McBryde Sugar Company, Limited, is authorized to maintain possession of the property until after de‧ fault in the payment of any of the bonds or interest thereon or any part thereof.   The first condition of the bond provides that if default shall be made in the payment of interest on the bonds after demand, or if there shall be a breach of any of the condi- tions of the bond and such breach shall continue for a period of three months, or interest remain unpaid after demand for said period that the trustees or their successors or assigns "may, and upon demand made against the grantor or its agents, shall be per- mitted to take" charge of the property and operate the same for the purpose of paying the interest from the surplus after paying operating expenses.

The second condition is that if the trustees shall take posses- sion under the first condition and they may deem it best not to operate the plantation then they may sell the entire property at public auction and apply the proceeds of sale as directed in the trust.

The fourth condition provides that "the power of sale herein- before set forth is in addition to the right of entry and fore- closure as now provided by law for mortgage foreclosure, or for any rights or authorities under proceedings in equity for such foreclosure; and nothing in this deed contained shall prevent the trustees, their successors or successor from proceeding under the

23-D

terms of this deed or the ordinary foreclosure proceedings as above mentioned."

The sixth condition is that "In case of default in the payment of interest on any of the bonds hereby secured, the coupons therefor having been presented and payment demanded, should such default in payment continue for the period of three months after such demand, then and thereupon the principal of all of said bonds, outstanding and unpaid shall, at the option of the holders of a majority of the said bonds, signified in writing, become immediately due and payable, provided that non-action of any of said bond-holders in case of any default shall not extend to and shall not affect, any subsequent default or any right arising therefrom."

This sixth condition it is claimed renders it impossible for the trustee (guardian) to foreclose or to collect the principal of the bond upon default of interest and that it is a delegation of his authority to the majority of the bond-holders and places it beyond his power to act upon his own motion as he is required to do by the terms of the trust. Is this position correct?

Judge Gresham, speaking for the United States Circuit Court for the District of Indiana, in construing a similar provision in a trust deed, said: "The Chicago & Alton Company agreed to pay interest on each bond, and it conveyed its property to trustees for the 'benefit, security, and protection of the persons and corporations, firms, and partnerships who should hold the bonds and interest warrants aforesaid, or any of them, for the purpose of enforcing payment thereof according to their tenor and effect.' The power of a majority to control proceedings to foreclose for the payment of principal when it shall become due, at the election of a majority before maturity in 1920, is not exclusive of the right which a single bond-holder has to enforce the security for the non-payment of any installment of interest on any bond. This right of a minority or even a single bond-holder, does not depend upon the consent of a majority. If it did, the company might refuse to pay interest on the bonds held by a minority until maturity according to their terms, and even after that time,

if some of counsel for defendant are correct in their position that neither before nor after maturity can the trust be enforced without the consent of at least a majority. The right which is asserted by the majority must be found in plain and explicit terms in the mortgage or it will not be recognized. It cannot exist by mere implication." *Farmer's Loan & Trust Co. v. Chicago & Alton Railway Co.*, 27 Fed. 146, 152, 153.

The Supreme Court of Pennsylvania said on this question: "When default occurs, the duties of the trustee become active and important. He represents all the bond-holders, and is under obligation to protect them so far as the property in his hands in trust for them will enable him to do so. If he neglects or refuses to move, any bond-holder may proceed by bill filed on behalf of himself and other members of the class of creditors to which he belongs, to compel a sale of the mortgaged premises, a removal of the trustee, or such other relief as may be appropriate. The bonds are not payable to the mortgagee, but to the bearer; they are not specialties but negotiable instruments, passing from hand to hand by delivery or endorsement; they find a market in all parts of the civilized world, and are held as an investment in moneyed institutions and by private persons. The mortgagee has no right to the custody of one of the bonds unless he buys it like any other investor, and they furnish him no choice of remedies. He is shut up to the remedies provided by the mortgage and those which the courts of equity may afford him for the purpose of bringing the mortgaged property to sale." *Commonwealth v. Susq. & Del. River R. Co.*, 122 Pa. St. 306, 319, 332.

"The trustee, as mortgagee," says the Supreme Court of Minnesota, "representing the interest of all the bond-holders as beneficiaries, is the proper party to institute foreclosure proceedings, but, if he unreasonably neglects or refuses to discharge his duty in the premises, doubtless any bond-holder may bring an action to enforce the security for the common benefit." *Seibert v. Minneapolis & St. L. Ry. Co.*, 52 Minn. 148, 156.

"It is plain that the principle which is gaining some ground, *that a majority of the bond-holders are to rule*, cannot be applied in all cases. Each bond is a separate contract with the

holder of the bond.    The corporation may elect to pay some
bond-holders and to postpone others; and if they pay all of the
bond-holders but one, can it be said that he is precluded from
proceeding with whatever remedies the law would otherwise
give him.    In the Supreme Court of the United States, where
this convenient but often unjust doctrine of the right of the
majority of the bond-holders to rule has sprung up, the clearest
and strongest expressions can be found of the rights of the single
bond-holder.    In a well-considered case in that court, where the
terms of the mortgage declared that the conveyance was for the
purpose of securing the payment of the *interest* as well as the
*principal* of the bonds issued under it, and declared that the
mortgagor's right of possession should terminate upon a *default
of the payment of the interest*, as well as the principal of any of
the bonds,—the court took the view that, independently of the
provisions of the other articles, the trustees of the mortgage, or,
on their failure to do so, *any bond-holder*, on the non-payment of
*any* installment of interest on *any* bond, *might file a bill for the
enforcement of the security*, by the foreclosure of the mortgage
and sale of the mortgaged property,    'This right,' said Justice
Matthews, 'belongs to each bond-holder separately, and its exer-
cise is not dependent upon the co-operation or consent of any
others, or of the trustees.    It is properly and strictly enforceable
by, and in the name of the latter; but, if necessary, may be pros-
ecuted without, and even against, them.    It follows from the
nature of the security, and arises upon its face, unless restrained
by its terms."    5 Thompson on Corporations, Section 6122.
*Chicago Railway Co. v. Fosdick*, 106 U. S. 47, 68.    *Dupee v.
Rose*, 10 Utah, 305, 309.

It is true that there are statements made in the text books of
abstract principles and the opinion in 39 L. R. Ch. Div. quoted
in the decision of the court below, seems to support the conten-
tion of the guardian *ad litem*.    However, no decision has been
called to our attention, and the exhaustive research of counsel
justify the inference that if there had been such decision it would
have been cited, applying the rule contended for to a provision
similar to the sixth condition of the McBryde company trust
deed above set out.    The authorities above quoted demonstrate
clearly that the rule contended for is not applicable to a trust
deed in the form of that under consideration.    The entire instru-

ment must be considered in its construction. Thus considered it appears that the deed was intended to protect the interests of the bond-holders, not that of a majority only but of the minority as well, and that it does not take away, or attempt to do so, from the bond-holder the usual and ordinary remedies, available to all in proper cases in a court of equity.

The trust deed is in the form demanded by commercial usage and by persons who seek investments in such securities. To sustain the contention of the guardian *ad litem* would be to deny the right of guardians and trustee to invest in such securities although we might know them to be as safe as government bonds. We are unwilling, even if it were admitted that there was in this case a technical delegation of authority by the guardian, to pursue a technicality to that extent. The rule requires that the trustee shall act honestly and discreetly and shall only invest in such securities as prudent men select when seeking investment of their own funds.

If the property covered by the trust deed is ample to secure the payment of the interest and principal of the bonds at maturity and is sufficient to commend them as safe investments to men of ordinary prudence and business judgment the guardian was justified in making the investment.

We do not understand that it makes any difference in the application of the rule relating to the investment of trust funds, in the absence of statute or rule of court, whether the trustee is testamentary or conventional except that in the former case the rule may be enlarged or restricted by the terms of the will.

If the bonds of industrial corporations are excluded, the field for the investment of trust funds in this jurisdiction is limited to real estate mortgages. There are no government or municipal bonds available within this Territory. If the question presented was one of "first impressions" this reason would, perhaps, appeal more strongly to the legislature than to the courts but the question in the case at bar is of changing a rule adopted after careful consideration and in operation for years without known disastrous effects and we consider this fact entitled to consideration.

On the question of the sufficiency of the security for the Mc-Bryde bonds. We will state without going into detail that we consider the evidence was ample to show that the property conveyed by the trust deed is sufficient security for the 750 bonds issued and the interest thereon.

As to the Waialua bonds the evidence was too meager to warrant a judgment and we express none. The evidence taken in the Bishop Estate matter and referred to in the decision of the court below was not made a part of the evidence in this case and was not considered. If there is any reasonable doubt in the mind of the court below as to the sufficiency of the security for those bonds that matter should be further investigated.

The objection to the investment in the Oahu Railway & Land Company bonds was based upon the form of the trust deed given to secure them. We have held that these objections were not well taken. The court below said relative to the value of the security for these bonds: "There is no evidence of witnesses before the court as to the financial standing of that company, but the court has had reference to newspaper and stock exchange reports covering a considerable period of time, as to the market value of its stock and bonds, from which it appears that its bonds have been for many months and are now selling above par and that its stock, while now selling at a little less than par, has frequently sold above par. Both are held in high repute." From this we infer that the court below would have approved this investment but for the form of the trust deed.

A further objection is urged that is fatal to a part of the investments. It appears that the guardian purchased at private sale seventeen of the McBryde bonds of the American Sugar Company, a corporation of which he was, at the time, a director and treasurer.

The court below said on this point: "The rule is inflexibly established that where in the management and performance of the trust, trust property of any description, real or personal property, the trustee cannot without the knowledge and consent of his principal directly or indirectly become the purchaser. Such

a purchase is always voidable and will be set aside on behalf of the beneficiary, unless he has affirmed it after obtaining full knowledge of all of the facts. It is entirely immaterial to the existence and operation of this rule that the sale is intrinsically a fair one, that no undue advantage was obtained, or that a full consideration is paid or even that the price is the highest which could be obtained. The policy of equity is to remove every possible temptation from the trustee. The rule applies just as forcibly where the trustee acts, as in this case, simply as the agent for another. 2 Pomeroy, 958. As a director and as the treasurer of the American Sugar Company, it was the duty of Carter to exercise an impartial and unbaised judgment as to the wisdom of a sale of the McBryde bonds; as the guardian of this minor it was also his duty to exercise a like impartial and unbaised judgment as to the wisdom of the purchase of the bonds by him as the trusted guardian of the interests of his ward."

It is no defense to this act of the guardian to say that he acted in good faith and that the other directors concurred in the sale and that no injury resulted to the estate. This is admitted. The trustee cannot purchase property for his *cestui que trust* from himself. The purchase of these bonds from the American Sugar Company, of which the guardian was treasurer and a director, violated a settled rule of law and the purchase cannot be approved over the objection on behalf of the ward. "The general principle," says the Supreme Court of Wisconsin, "upon which this proposition must rest, is that no man can faithfully serve two masters, whose interests are in conflict. And as men usually and naturally prefer their own interests to those of others, where one attempts to act in a fiduciary capacity for another, the law will not allow him, while so acting, to deal with himself in his individual capacity." *Pickett v. School District*, 25 Wis. 551, 553. "The general rule on this subject is, when a trustee of any description, or a person acting as agent for others, sells a trust estate, and becomes himself interested, either directly or indirectly, in the purchase, the *cestui que trust* is entitled, as a matter of course, at his election, to have the sale affirmed or set aside."

*Borders v. Murphy*, 125 Ill. 577, 583; see also, *Cumberland Coal Co. v. Sherman*, 30 Barb. 553; *Litchfield v. Cudworth*, 15 Pick. 23, 31; *Tomuine v. Hendricksen*, 27 N. J. E. 162; 27 Am. & Eng. Encyc. Law, 195, 196, 202; *Christley v. Magoon*, 13 Haw. 402; *Hitchcock v. Hustace*, 14 *Id*. 232.

The decree appealed from is reversed except so far as it relates to the seventeen McBryde bonds purchased of the American Sugar Company and as to that it is affirmed and the cause remanded for such further proceedings as may be necessary or proper, consistent with the foregoing opinion.

*Robertson & Wilder* and *Hatch & Silliman* for the guardian.

*J. J. Dunne*, guardian *ad litem*, in person.

### CONCURRING OPINION OF PERRY, J.

The English rule referred to in the foregoing opinion, that trust funds may not be invested otherwise than in government bonds and real estate mortgages, was not, as I understand it, a part of the common law, but merely a rule adopted by the courts of chancery in the exercise of their discretion and in the enforcement of the fundamental principle that such investments should be only in the safest securities. See 11 Am. & Eng. Encycl. Law 815; Woerner on Guardianship, Sec. 63, p. 211. If this view is correct, Section 5 of the Judiciary Act of 1892, which enacted the common law of England, with certain stated exceptions, as the common law of Hawaii, has no application in this matter, and the court was, in 1894, in the case of *In re Banning*, and is now in this case, in the consideration of the subject, unhampered by any statutory enactment. If, on the other hand, the rule first above referred to, is to be regarded as a part of the common law of England, still the final result is the same. One of the exceptions named in the Act of 1892 is, "except as otherwise * * * fixed by Hawaiian judicial precedent." Prior to the passage of that Act, to-wit, in February, 1890, and in September and again in October, 1892, this court, in the Estate of W. C. Lunalilo (Probate Records No. 2414), permitted and approved the invest-

ment of trust funds in the bonds of at least two industrial cor-
porations, the Wailuku Sugar Company and the Oahu Railway
and Land Company, and in the stock of one mercantile corpora-
tion, C. Brewer & Company, Limited.   Whether or not similar
investments were approved in other cases, I am not prepared to
say, but sufficient appears to show judicial precedents contrary to
the alleged requirements of the common law.   In the Banning
case, closely contested by eminent counsel as it was, the point
was not even suggested.

What the court said in the case last mentioned on the subject
of the investment of trust funds, was not *obiter dictum*; it was
upon a point directly involved and elaborately argued.   It is an
insufficient answer to say that the trustee there was acting under
a will, for the direction of the will was that investments were to
be made "in good securities with lower rates of interest in prefer-
ence to high rates with corresponding risks."   The court did not
hold, nor could it well have done so, that this furnished to the
trustee greater freedom of action than, in the absence of a will,
the law would have allowed.

While concurring in the view that the decisions of this court
rendered prior to annexation are binding on the Circuit Courts of
this Territory unless and until reversed or modified, I do not
think that the decision of the United States Circuit Court of
Appeals for the Ninth Circuit, in the case entitled *The
Schooner Robert Lewers Company v. Kamaka Kekauoha*, 114
Fed. ——, is to any great extent an authority in support of that
view.   All that the court there decided was that a certain deci-
sion reported in 2 Haw. 209 (1860) was a "judicial modifica-
tion" of the common law of England within the meaning of Sec-
tion 5 of the Act of 1892 and that therefore the common law
rule under consideration in that case did not apply.

Except as modified by the foregoing, I concur in the opinion of
the majority.