IN THE MATTER OF THE GUARDIANSHIP OF
THE ESTATE OF RICHARD SMART, A MINOR.

No. 2087.

Submitted June 1, 1933.　　　Decided January 24, 1934.

Perry, C. J., Banks and Parsons, JJ.

944

OPINION OF THE COURT BY BANKS, J.
(Perry, C. J., dissenting in part.)

On March 7, 1932, the Trent Trust Company filed a petition in the court of domestic relations asking leave to resign the guardianship of the estate of Richard Smart, a minor. On March 12, 1932, the resignation was accepted and Alfred W. Carter was appointed as guardian. On March 17, 1932, the resigning guardian filed its final account. This account was referred to two masters. On September 3, 1932, the masters filed their report in which they recommended that certain items of investment made by the retiring guardian be surcharged against it and that otherwise the account be approved. The circuit judge adopted the recommendation of the masters as to one only of these items. In all other respects the account of the retiring guardian was approved. Exceptions to the decree were taken by both the incoming and retiring guardians and both have appealed to this court.

Before considering the item that was surcharged against the retiring guardian it seems appropriate to dispose of an objection made by the Trent Trust Company

to the entry of any judgment against it arising out of its conduct as guardian. There was offered in support of the objection the affidavit of A. E. Steadman, executive vice-president of the Cooke Trust Company, Limited, the receiver of the Trent Trust Company. It appears from the affidavit, which was dated December 20, 1932, that the receiver was appointed on January 9, 1932, and on January 29 of the same year published notice to creditors to present their claims within six months from said date and that the period for presenting claims would expire on July 29, 1932. Said affidavit also recited that Alfred W. Carter was duly appointed guardian of Richard Smart on March 12, 1932, and that no claim on behalf of said minor was presented to the receiver. The objection was overruled by the circuit judge and his action is assigned as error.

Section 3487B, R. L. 1925 (Act 178, L. 1925), provides that "Immediately after the appointment of any such receiver, he shall advertise in such newspaper or newspapers as the court shall direct, for as long as the court may order, at least once a week for four weeks, a notice to all creditors of and claimants against such trust company to present their claims with proper vouchers, or duly authenticated copies thereof, to him, either at his residence or place of business, within such time as said court shall direct, but within not less than six months from the first day of such publication and within seven days of the date of the first publication shall mail a like notice to every creditor whose address is known. And if such claims be not presented within such time as shall be directed by said court they shall be barred from any participation in the assets of said company, and the receiver shall not be authorized to pay them."

It is apparent from the statute that the legislature intended that the notice provided for should be given only

to creditors of the trust company. As we shall presently see, so far as the item surcharged by the circuit judge against the guardian was concerned, there could be no such relation between the minor and the trust company as exists between a debtor and his creditor. The funds of the ward, which by judicial order were committed to the keeping and management of the guardian, were in no sense a loan. They remained the property of the ward. Any culpable neglect or imprudence by the guardian in the investment of the funds or the management of the estate was therefore a breach of trust and not a breach of contract.

There is another reason, appearing in the statute itself, why the power of the court to enter judgment against the Trent Trust Company was not affected by the failure to present claims to the receiver. The only embargo placed by the statute upon creditors who fail to seasonably present their claims is that they shall not participate in the assets of the trust company. Even, therefore, if the minor in the instant case had been a mere creditor the failure to present his claims against the Trent Trust Company would not have prevented the entry of a decree against it and the statute would have presented no impediment to proceeding against the latter's bond for satisfaction of the decree. Moreover, there is nothing in the statute which would have precluded the ward from recovering from the Trent Trust Company assets which were a part of his estate and were never a part of the assets of the trust company.

The objection was properly overruled.

The item which was surcharged against the outgoing guardian was a loan of $50,000 made on January 25, 1928, to Frank Santos, for a period of three years. The record discloses that the security for this loan was a first mortgage on 49,383 square feet of land on the makai side of

Vineyard Street between Emma and Punchbowl streets in Honolulu, known as "Santos Court," on which were located several apartment houses. The mortgage also included some four and one-half acres of Pauoa Valley land used and occupied as a dairy. In June 1929 the mortgagor became delinquent in his payment of interest. The guardian, who by the terms of the mortgage was authorized to foreclose upon the happening of this event, never exercised its right and the debt has never been paid.

It also appears from the record that on the same day that the loan above referred to was made another loan of $25,000 was made to Santos. The money which was loaned on the second occasion was contributed by certain clients of the Trent Trust Company and by the trust company itself. This loan was secured by a second mortgage on the identical property included in the first mortgage, and in addition certain personal property which was unincumbered. The mortgage was made to "Trent Trust Company, Trustee and Mortgagee."

It is apparent that the Trent Trust Company, by taking a second mortgage as security for a loan of its own money and that of its clients, placed itself in a position which subjected it to the temptation of protecting its own interests, and those of others whom it represented, to the detriment of its ward's estate. That it did in fact yield to this temptation is implicit in the facts as they were found by the masters. They said in their report: "We are of the opinion that if the mortgage had been foreclosed in 1929, when it became delinquent, the property could have been sold for a sufficient sum to cover the amount due on the first mortgage. It is apparent to us from the testimony of Mr. J. D. Marques and Mr. William R. Warren that in 1929 and thereafter the Trent Trust Co., Ltd., was trying to sell the property for around $80,000, a sum sufficient to take care of the

first and second mortgages and that they were trying to protect the second mortgage at the expense of the first mortgage."

The circuit judge made very much the same criticism of the guardian's failure to foreclose the first mortgage as did the masters, saying in effect that the guardian, by taking the second mortgage for several of its clients, placed itself in the inconsistent position of serving two masters and that "the duty of trying to salvage something for the second mortgage, if possible, must necessarily have played a part in the question of decision of what should be done in rescuing the first mortgage."

The only action taken by the Trent Trust Company was an effort to find a purchaser for the Santos Court property at $80,000 or $85,000, which, had it been successful, would have been sufficient to discharge the indebtedness secured by both mortgages. From the testimony it is easy to see that this effort was foredoomed to failure.

It can be fairly presumed that when the guardian became trustee and mortgagee under the second mortgage it expected compensation for its services to its clients whose money was invested in the mortgage. That it also anticipated other profits from the second mortgage is clearly shown by the fact that it held in its own right an interest in the second mortgage. No one will controvert the principle announced in *Estate of Isenberg,* 28 Haw. 590, 672 (and approved by the ninth circuit court of appeals in *Isenberg* v. *Trent Trust Co.,* 26 F. [2d] 609, 615): "Courts cannot emphasize too strongly the duty of trustees to accept or hold no office or position imposing upon them interests or duties in conflict with their duties to the beneficiaries whom they represent as trustees or which will in any wise embarrass them in the performance of such duties as trustees."

In the instant case, when the opportunity presented

itself to foreclose the first mortgage, the guardian had to choose between what it considered the interests of its ward and its own interests and those of the clients for whom it was acting as trustee. It was then that the guardian should have been free from a divided allegiance or any entangling alliance which might becloud its judgment. If it had been unembarrassed by other considerations and had been entirely free to consider the interests of its ward alone it might have foreclosed the first mortgage when it had the right to do so and thus have rescued the investment it had made of its ward's funds from the abyss into which it later fell. At all events the ward was entitled to the exercise of an untrammeled judgment. Not having had this the guardian must suffer the consequences.

We come now to the appeal taken by Alfred W. Carter, the succeeding guardian.

The first specification of error to be considered relates to that portion of the decree wherein it is ordered "that upon the assignment" by "Alfred W. Carter" to the "Trent Trust Company * * * or to whomsoever it may direct" of the "mortgage dated the 25th day of January, 1928," executed and delivered by "Frank Santos" to the "Trent Trust Company" as security for the loan, the Trent Trust Company "shall pay to" Alfred W. Carter "the sum of $50,000 so loaned * * * together with such net accumulated income from said property, if any, as said Trent Trust Company * * * may have in its possession at the date hereof."

It is contended by Carter that instead of requiring the outgoing guardian to pay to him, in addition to the sum of $50,000, only the net accumulated income from the Santos property, which it had on hand at the date of the decree, the judge should have required the payment of interest, at seven per cent, as provided by the mortgage.

It is provided in the second mortgage that the rents of the Santos property (which were not included in the first mortgage but were assigned as security to the mortgagee in the second mortgage) shall, after the payment of taxes, insurance and other items, be applied by the mortgagee to the payment of the interest that shall accrue upon the promissory note of the mortgagor secured by the first mortgage.

It appears from the evidence that during the years 1928-1932 the Trent Trust Company, in obedience to this provision, paid, as interest, some $11,140 to the Smart estate. This sum represents a rate of interest of nearly five and one-half per cent per annum on $50,000. The judge in his written decision said on this subject: "In view, however, of the fact that Trent Trust Company utilized its powers under the second mortgage in paying over to the minor's estate a reasonable amount of income on the principal involved, it is the decision of this court that the retiring guardian be ordered to turn over to the incoming guardian the principal sum of $50,000.00 upon assignment back, to whomever the retiring guardian may direct, of the security held by the incoming guardian in this mortgage."

In view of these facts and the conclusion of the judge it is evident that, in decreeing what should be paid by the outgoing guardian to the incoming guardian on the Santos loan, he did not intend to decide that no interest was chargeable. He did not mention interest in his decree for the obvious reason that he considered that a reasonable income on the loan had already been paid to the Smart estate. Moreover, the $50,000 loaned to Santos may be treated as though the loan had never been made. The liability of the outgoing guardian, so far as interest is concerned, should therefore be the same as it would have been if it had kept the money without investment.

That is to say, it is chargeable with interest at the rate it could have obtained upon a sound investment.

In *In re Estate of Espinda,* 9 Haw. 342, an executrix had failed to pay money due the legatees and in charging her a rate of interest which the legatees could have obtained in safe investment, the court said (p. 345) : "It being dead money in her hands and she not using it or receiving interest upon it she is not chargeable with the legal rate of interest or the highest sum that could be obtained, but such a rate as the beneficiaries could have obtained upon a safe investment if paid to them. In the absence of proof of what this rate would be, we fix six per cent as the rate, being that payable on government bonds." See also *Estate of Isenberg,* 28 Haw. 590, 682.

It cannot be said that there was no evidence of what would be a reasonable rate of interest upon sound investments. The judge had before him evidence of other investments of the Smart estate made by the guardian, the soundness of which, unlike the Santos loan, is not questioned. These investments were made in government bonds and bonds of local concerns, and the average rate of interest was approximately the same as that paid on the Santos loan. Of course the liability of the Trent Trust Company for interest did not cease upon its resignation of the guardianship. It continues until the Smart estate is reimbursed in the amount of the Santos loan.

The next assignment of error relates to that portion of the decree regarding two loans made to Farm Cornn. The first of these loans was in the sum of $12,000 and was made on August 28, 1928. The second loan, in the sum of $3000, was made on March 12, 1929. Both loans were secured by mortgages on the same property which consisted of a house and lot situate on Wilder Avenue. Both loans matured on August 29, 1930. The interest was paid by the mortgagor up to June 1929. In January 1930

Farm Cornn sold the property to the Central Investment Company. This sale was made subject to the mortgages but there was no assumption of the mortgage debt by the purchaser. Thereafter the Central Investment Company paid the interest up to March 1930. After making many unsuccessful efforts to negotiate a private sale of the property for an amount sufficient to pay the mortgages the Trent Trust Company on September 19, 1930, the loans having matured, directed its attorneys to institute foreclosure proceedings. Discovering, however, that there was no prospect of obtaining satisfaction of the mortgages by foreclosure and that a deficiency judgment against the mortgagor would be worthless the matter was abandoned. On November 5, 1930, the Realty Auction Company, a subsidiary of the Trent Trust Company, took a deed to the property at a stated consideration of one dollar. The Realty Auction Company, after acquiring title, paid all the interest, including back interest, that was due up to August 29, 1931.

The masters recommended that the Farm Cornn loan be surcharged against the outgoing guardian. In their report they said, in substance, that while the value of the property justified the first loan of $12,000, the subsequent imposition of an additional burden by the loan of $3000 was too heavy a load for it to safely bear and that the investment was therefore an improvident one. The circuit judge took a different view and in his decree ordered the Trent Trust Company, if Alfred W. Carter, the existing guardian, so desired, to obtain from its subsidiary, the Realty Auction Company, an assignment and conveyance to Carter of the equity of redemption in the premises included in the Farm Cornn mortgages.

It is contended by Carter that the judge was, for several reasons, in error in crediting the outgoing guardian with these loans. The first reason assigned is that

the property on which the loans were made was not of sufficient value to justify the investment.

The judge, in considering the testimony given at the masters' hearing, reached the conclusion that the investments were sound at the time they were made and should be approved.

At the time of these loans the Trent Trust Company's appraisers, Messrs. Spain, Lyle and Moniz, shown by the evidence to have been experienced real estate dealers, appraised this property at $25,685. On April 22, 1932, Messrs. O'Connor, Walsh and Steere, also shown to be experienced realtors, at Carter's request, appraised the property, as of August 29, 1928, at $19,863. On the same day they also appraised it, as of March 10, 1929, at $18,192. The evidence discloses that the appraisers of both parties were in agreement as to the value of the land at the time of the first loan, that value being $17,685, but were in disagreement as to the value of the building. Carter's appraisers placed the value of the building at $2,178. The appraisers of the Trent Trust Company appraised it at $8000. The appraisement of the Carter appraisers was based on the age of the building (which was thirty-five years) and their opinion that it had been seriously damaged by termites. None of them, however, seems to have made a critical examination. E. M. Ehrhorn, an admittedly expert entomologist with large experience in Honolulu, testified that he examined the building on the day before he was called as a witness. His examination was quite thorough, lasting for two hours. In substance his testimony was that the lumber used in the building was far superior to lumber that is used today and therefore the house was less "susceptible to the attack of termites;" that a few portions of the building were infested by a termite known as the "old borer" or "dry borer," which works slowly and is therefore not as danger-

ous as the subterranean or ground-invading termite; that infestation was very slight and the cost of treatment for the extermination of termites and repairing the infested parts would amount to less than one hundred dollars.

We are of the opinion that the conclusion of the judge regarding the soundness of these investments should not be disturbed.

The next reason given in support of the contention we are now considering is that the Trent Trust Company was culpably negligent in not foreclosing the Farm Cornn mortgages when upon the defaults in the payment of interest it had the right to do so. As we have already seen, there were two such periods, the first being from the middle of 1929 to January 1, 1930, and the second from March 1930, to November 1930. During these periods the guardian, unlike its position in the Santos mortgages, was free from any entanglements that might tempt it to sacrifice the interests of its ward to those of itself and those of its clients for whom it was acting as trustee. It was entirely free to take whatever course the best interests of its ward dictated. We will therefore consider the standards by which fiduciaries *so situated* are to be judged in the management of trust property.

It is said in *Gould* v. *Hayes,* 19 Ala. 438, 459: "It is the anxious desire of courts of chancery to protect trustees from harm, who act in good faith, and not to subject their conduct to the application of such harsh and rigid rules as to deter all prudent men from assuming fiduciary duties and relations. The court must also look to the number and nature of the duties to be performed, and while it will exact the exercise of that care, diligence and forethought in the discharge of those duties which a prudent man would bestow upon his own business of a similar character, it will not be astute to hunt out and seize upon every slight departure from the strict line of

discretion and good management. Nor should it look merely at the result, which may be unfavorable to the interest of those concerned, and conclude from thence, that the trustee has been guilty of gross negligence or mismanagement, since it often happens that the best laid schemes fail of success. Such is the imperfection of our nature, and the vicissitudes to which we are exposed, that even the most wary, discreet and prudent are not exempt from misfortunes and failures." The same standard of conduct is also laid down in *Stanley* v. *Colt,* 72 U. S. 119, in which the court said (p. 167) : "Of course, the trustees, subject to the limitations and restrictions annexed to the enjoyment of the estate, possess all the power and dominion over it that belongs to an owner, and are bound to take the same care of it and exercise the same attention, skill, and diligence in its management that a prudent and vigilant owner would exercise over his own." This principle is reiterated in *Winder* v. *Nock,* 104 Va. 759, 763: "The settled rule is that only the care of an ordinarily prudent business man is required of a trustee. In Minor's Institutes, the learned author says: 'It is indeed observable that whenever a fiduciary is called to account and a liability is sought to be fixed upon him, the enquiry must ever be, whether, in the transaction in question, he acted within the scope of his powers, with good faith and ordinary prudence. * * * This is, indeed, nothing more than the application of an old principle, which has long governed trusts of all kinds, namely, that nothing more should be required of a trustee than to act in good faith, and with the same prudence and discretion that a prudent man is wont to exercise in the management of his own affairs.' " The following duties are outlined in *Morrow* v. *County of Saline,* 21 Kans. (2d ed. Ann.) 352, 373: "A trustee is not an insurer. He is not absolutely bound for the results of his actions. He must exercise the highest

good faith. He may not speculate in the property placed in his hands. He may not acquire any interest adverse to the trust. He is bound to use care and diligence in the execution of the trust and the management of the trust property—as much care and diligence as a man of prudence would in his own affairs. Having done all that, he is not responsible for mere error or mistake." In *Ellig* v. *Naglee,* 9 Cal. 683, it is said (p. 695) : "Very supine negligence, or willful default, will render them liable; but to make them liable for mere errors of judgment would tend to discourage good and prudent men from undertaking any trust."

In laying down these rules the courts had under consideration not the original investment of trust funds but the subsequent management of the investments. As will appear in a later portion of this opinion this distinction is important.

Measured by these rules, is the failure of the Trent Trust Company to foreclose the mortgages to be condemned? In considering this question it is necessary to have in mind the conditions under which the failure occurred. The masters in their report said: "In 1929 prosperity flowed like a blessing over the Territory. All was secure. Real estate moved confidently along. Subdivision lots were moving more slowly not because there was anything inherently wrong about them but because there were too many of them. Then came the New York stock market crash in October, 1929, and coincidentally world depression. Nevertheless the local real estate market held out pretty well up to the middle of 1930 when it sagged heavily, a condition which has prevailed from that time until the end of the period, March 14, 1932, herein reported on. During this period, from the middle of 1930 the saleability and value of real estate has become a matter of pure conjecture. There is no measure."

As appears from the masters' report, when the first default in interest occurred (in the middle of 1929), the real estate market was still good. There was nothing to indicate that it would not so continue. When the second default occurred, following March 1930, the market was still active. Even at this time there was no sure guide for business men to follow. No one could foresee what was to come after the middle of 1930.

Under these circumstances it would be too severe a judgment to say that the penalty now invoked by Carter should be imposed upon the Trent Trust Company for its failure to adopt a course which in the light of subsequent events might have saved the investment. It cannot be said that the course adopted by the guardian was contrary to the dictates of prudence and sound business practice. At most it was an error of judgment. This is all that can be imputed to it. If a guardian, *in dealing with the security* upon which he has loaned the funds committed to his care, is chargeable with the consequences of such errors, the hazards of the office would be so great as to render it difficult to find a competent person willing to undertake the responsibility. Of course, in order to avoid personal liability, the guardian must at the time his judgment is formed and acted upon be free from other relations that are inconsistent with his duty to his ward.

Still another reason offered in support of the contention we are now considering is that when the Realty Auction Company, which is owned by the Trent Trust Company, took the title to the Farm Cornn property the latter placed itself in the inconsistent position of being both the mortgagor and mortgagee. The reason for the rule which prevents a guardian from taking a position inconsistent with the interests of his ward is the fear that he may be tempted to favor the outside interests to the detriment of those which it was his sole duty to protect.

When the Trent Trust Company, through its subsidiary, acquired title the crash in the market had come and the property had fallen so low in value as to be worth much less than the mortgage debt. All that it obtained therefore by the deed to the Realty Auction Company was an equity of redemption upon which it could at that time realize nothing. In order to exercise this right to redeem and thus perfect its title it was necessary that the indebtedness of the original mortgagor to the Smart estate be fully paid. In these circumstances the guardian surrendered no rights which it had under the mortgages nor did it acquire for itself any interest which conflicted with those rights. This is made even clearer by a stipulation that was entered into at the masters' hearing that if certain witnesses were called they would testify that the title to the property was taken "so as to give Trent Trust Company control of the property without the expense of foreclosure proceedings and without prejudice to the right of the Trent Trust Company to foreclose later if a deficiency judgment should later appear to have value." This acquits the guardian of any purpose to deal with the property, even if it could have done so, for its own benefit.

Under the judge's decree Carter, the present guardian, is placed in the same position that his predecessor was in before its resignation. He may either hold the mortgages and foreclose them if a deficiency judgment against the mortgagor turns out to be of value, or he may take title to the property from the Realty Auction Company if that seems to the best interests of his ward's estate.

We think it was not error to credit the Trent Trust Company with the mortgages in question.

The next assignment of error relates to a loan made on October 21, 1928, to Doctors Lam and Chang, in the sum of $36,000. The security was a mortgage on real

estate located at the corner of King and Cooke streets in Honolulu. There were on the property a store building, a small house and a large house in the rear. Both of these houses were old and in poor condition. The loan became due on October 1, 1931, and was not paid, but the interest was fully paid up to March 14, 1932. No effort was made to foreclose the mortgage.

The masters recommended that the accounts of the Trent Trust Company, so far as they concerned this loan, be approved. The recommendation was adopted by the circuit judge. It is contended by Carter that this was error, for two reasons, first, because the loan was insufficiently secured, and second, because the Trent Trust Company was at fault in failing to foreclose the mortgage when the loan became due.

It was stipulated at the masters' hearing that if witnesses were called they would testify that at the time the loan was made the appraisers of the Trent Trust Company valued the property at $61,275 and that Messrs. Steere, Walsh and O'Connor (who were, as we have already seen, Carter's appraisers) appraised it as of that date at $55,270. We think there was not sufficient difference between the appraisal of the Trent Trust Company appraisers and that of the Carter appraisers to justify the condemnation of the loan as improvident. The masters expressed the view, which was evidently concurred in by the judge, that "this loan was made after careful appraisement and investigation and upon a sufficient margin of security."

We think also that the guardian should not be charged with culpable negligence in failing to foreclose the mortgage after the debt became due. It was stipulated at the masters' hearing that "On July 22, 1931, Trent Trust Company wrote Drs. Lam and Chang calling their attention to the fact that the loan would mature on October 1, 1931,

and asked that they give this matter their attention. On September 30, 1931, Trent Trust Company obtained a statement of their" (meaning Drs. Lam and Chang) "personal holdings and liabilities and satisfied themselves that no further security was available. On October 15, 1931, Drs. Lam and Chang agreed to deposit with the Mutual Building and Loan Society of Hawaii the sum of $200 per month commencing November 1, 1931, until the sum of $20,000 had been paid in full, with the right to apply on account of the principal of the note for $36,000, sums of $1000 as the same should accrue. To date they have paid as follows: November, 1931, $200; December, 1931, $200; Interest, $1.00; March, 1932, $200; May, 1932, $200." The masters in their report, referring to this loan, said: "Interest has been kept up or provided for. The two doctors are in partnership or at least occupying the same quarters, and from our inquiries, are enjoying a good practice. As we remarked with reference to the Dung Ngun Chung mortgage we believe it would not have been 'good business' for the retiring guardian to have foreclosed this mortgage. The property is business income producing property, sufficient in amount to cover interest, taxes and other charges. At the time the note fell due on October 1, 1931, the Trent Trust Co. appraisers valued the property at $41,483.00, and Steere, Walsh and O'Connor, at $44,158.00, at a time when real estate values had shrunk enormously. The masters feel in this case that the retiring guardian used prudent care and investigation when he made the investment and that the loan was good at that time and is good at the time March 14, 1932, when it was sought to turn this loan over to the successor guardian."

The guardian was again obliged to choose between foreclosure of the mortgage and granting an extension of time for the payment of the loan. There is nothing to

indicate that its decision was influenced by any considera-
tion other than what it conceived to be the best interests
of its ward's estate. If it acted unwisely, which accord-
ing to the masters' report seems not to be true, it was
an error of judgment for which, under the circumstances,
it should not be penalized.

The next assignment of error concerns a loan of $4,500
made by the guardian to Dung Ngun Chung on August
31, 1926, with interest at seven per cent. When it be-
came due on August 31, 1929, it was renewed for three
years at eight per cent, the date of maturity being August
31, 1932, or five months after the masters had completed
their hearings. The loan was secured by a mortgage on a
parcel of land situate on Fort Lane near Fort and Vine-
yard streets in Honolulu and three houses thereon.

Carter finds fault with the guardian because, as he
claims, when the loan became due on August 31, 1929,
the property was not of sufficient value to justify a re-
newal and the mortgage should have been foreclosed.

It seems to be undisputed that when the loan was first
made it was sufficiently secured, the appraised value of
the property at that time being $7,720. The masters, as
we have already seen, expressed the opinion that the real
estate market reached its peak in 1928 and that in 1929
real estate moved confidently along and everything was
secure, and even after the New York stock market crash
in October 1929 the local real estate market, up to the
middle of 1930 when it sagged heavily, held up pretty
well. These observations were no doubt based upon a
careful investigation and consideration of prevailing con-
ditions during the periods mentioned. There is no suf-
ficient reason to think that the masters were mistaken.
It is true, under a stipulation made at the masters' hear-
ing, that Steere, Walsh and O'Connor appraised the Dung
Ngun Chung property on March 14, 1932 (which was

after the collapse of the market), and gave it as their opinion that on August 31, 1929, its value was $6,130. The masters, as shown in their report, did not think highly of this appraisement, saying, "The present criticism of it" (the Dung Ngun Chung property) "is based on a senseless valuation under conditions of depression not intended by the Carter appraisers as a valuation but, as hereinbefore expressed, as an opinion."

The circuit judge in considering certain mortgage investments made by the Trent Trust Company, including the renewal of the Dung Ngun Chung mortgage, said: "In connection with this entire question this court feels that it cannot be too often emphasized that the same must be examined from the standpoint of the facts as they existed at the time of the loans and as they developed thereafter, and not in connection with 'hindsight,' as we now know the facts in light of recent experience with general depression."

We believe, from the entire record, that at the time the loan now in question was renewed the value of the property had not depreciated to such an extent as to render the renewal dangerous to the Smart estate.

Carter also contends that the Trent Trust Company was culpably negligent in not foreclosing the mortgage during the period of default in the payment of interest. This default occurred on November 30, 1930, and continued until January 30, 1931, when the interest was paid. Since then there has been no default. When the interest became delinquent the guardian endeavored through several brokers and others to sell the property for enough to pay the loan, but without success. It also made a fruitless attempt to obtain additional security. The mortgagor had other properties but they were not available for the reason that they were already encumbered. The guardian then attempted to effect a con-

solidation of all the mortgages which it believed would be beneficial to the trust estate, but again without success. As in the Lam and Chang mortgage, it found it necessary to decide between foreclosure and extension. The market had become demoralized. Values were conjectural. Foreclosure therefore, during the period of default, would undoubtedly have been barren of any benefits to the estate at all proportionate to the amount invested. The only probable result of such proceedings would have been either to let the property go at a nominal price and obtain a worthless judgment for the deficiency or to buy it in for the amount of the mortgage debt, thus incurring all the expense incident to ownership. In its abstention from foreclosure the guardian but adopted the opinion held and acted upon by many people of reputed wisdom, that prosperity would soon return and market values again become normal. But, as appears from a stipulation referred to in the masters' report, the rentals amounted to $72 per month and there were rare vacancies. William R. Warren, the secretary and cashier of the Trent Trust Company, testified that the rentals were all along collected by that company and used primarily to pay interest and taxes. It was under the foregoing circumstances that the guardian decided to grant the extension. Its judgment was admittedly unbiased and honest and, in the opinion of the masters, was not even erroneous. But even if the guardian was mistaken in its judgment it was an error for which, under the rule we have already considered, it should not be held responsible.

The last assignment of error dealing with mortgage investments made by the guardian relates to the Chang Shew Ming loan. Carter contends that this loan was improvident because the security was inadequate. The loan was made on March 10, 1928, in the sum of $6000. It became due on March 10, 1931, and was not paid. The

security was a mortgage on a parcel of land consisting of 10,599 square feet and situate at the corner of Azores and Punchbowl streets in Honolulu. The mortgage included a house, located on the premises, which was insured for the sum of $4000 upon which premiums were paid up to December 1, 1934. It was stipulated at the masters' hearing that "the *assessed* value for 1928 was land, $3165, improvements, $2717. At the time of the making of the loan the property was appraised by Messrs. Lyle, Taylor and Moniz, employees of the Trent Trust Company, Limited, at the total of $12,000, namely, $7000 for the land and $5000 for the improvements. On April 22, 1932, Messrs. Steere, O'Connor and Walsh appraised the property as having a total value of $6940, made up of land, $4223, improvements, $2717, as of March 1, 1928."

There is no question of the competency and honesty of the Trent appraisers. The only contradiction of their estimate of the value of the property is the *assessed value for taxation purposes* and the value placed upon it by the Carter appraisers. The probative force of the Trent appraisement is, we think, greater than that of the tax assessor or that of the Carter appraisers. It is common knowledge that the appraisement of property for the purposes of taxation, especially when the real estate market is active, is often less than its true market value. The Carter appraisement was influenced no doubt by the condition of the market at the time it was made. That it was so influenced is indicated by the testimony of Walsh given at the masters' hearing. In answer to the following questions propounded to him he gave the following answers: "Q How do you account for the difference between the appraisement of the Trent Trust Company of $12,000 and your appraisement of $6940? A I don't account for it." Q "Could it be accounted for to any extent, Mr. Walsh, by the fact that your appraisal was

made in 1932 and theirs in 1928? A Perhaps part of the difference might be in that. Not all of it." Q "Our views in determining the value of something a year or two ago or three is greatly colored by what has happened in the meantime? A It is not supposed to but unconsciously does sometimes. A man is not supposed to be influenced by that but he would have to be a superman to avoid it."

The masters recommended a surcharge of the loan not on the ground that the investment was at its inception improvident but, as we shall presently see, for an entirely different reason. The evidence does not justify a surcharge of this loan.

Carter also contends that the guardian was derelict in its duty in not foreclosing the mortgage when the loan became due. As we have already seen, this occurred on March 10, 1931, at a time when the market was stagnant. It was stipulated that "the property was appraised on March 4, 1931, by the Trent Trust Company appraisers at that time as land, $3168, improvements, $2850. The appraisal by Messrs. Steere, O'Connor and Walsh on April 22, 1932, fixed the value of the total property as of March 4, 1931, at $5558, made up of land, $3168, improvements, $2390." On March 11, 1932, the date when the outgoing guardian's account was closed, the total value of the property, according to the appraisement of the Carter appraisers, was $4,190. No other appraisement was made.

It was stipulated that "On January 10, 1931, the Trent Trust Company wrote to the mortgagor calling attention to the fact that the mortgage matured on March 10, 1931, and asked that necessary steps be taken to meet the obligation. Mortgagor was again reminded on January 11 that the mortgage had become due and this letter demanded that action be taken to arrange for payment of the mortgage under threat of foreclosure proceedings." On neither occasion was the mortgagor able to procure

the money required. It appears from the testimony that she had no other property and therefore, in the event of foreclosure, a deficiency judgment against her would have availed nothing.

Still again, the guardian must decide whether to foreclose or let the loan ride. In choosing the latter course, was it guilty of culpable negligence? The masters thought it was and recommended a surcharge. The circuit judge thought it was not and refused a surcharge. The former in their report said, in substance, that in view of the fact that the Trent Trust Company's appraisers valued the property at $6018 on March 4, 1931 (which was only eighteen dollars more than the mortgage debt), and because of the unsteadiness of the mortgagor in keeping up interest, insurance, taxes and repairs, the retiring guardian should have foreclosed at once so that it would be in a position to improve the property, rent it out and await better times, rather than allow a deteriorating security to remain in the control of others. The judge in his decision said, in substance, that he did not feel justified by the evidence in finding that the guardian was guilty of such negligence in regard to this investment as to impose upon it the burden of restoring to the minor's estate the amount of the loan.

As we read the testimony we think the masters were not quite accurate in thinking that there was unsteadiness in the payment of interest. There was only one such default, which occurred on December 10, 1931, and continued until February 12, 1932. Interest was then paid and was not again due until after the Trent Trust Company had tendered its resignation. It was stipulated that the insurance premiums on the house were paid up to December 1, 1934. We find nothing in the testimony relating to delinquencies in tax payments nor do we find anything relating to the condition of the premises. Fore-

closure might have been the wiser course even though it resulted in the acquisition of the property for the minor's estate and the extinguishment of the loan. But it cannot be said with any degree of certainty that the course taken by the guardian was so opposed to the opinion of men of prudence and sound judgment in the management of their own affairs as to merit judicial condemnation.

The next assignment of error relates to two investments made by the outgoing guardian in the promissory notes of the Hawaiian Pineapple Company, Limited, an Hawaii corporation. These investments were made in the year 1931. The first, which was in the sum of $20,000, was made in April of that year, and the second, which was in the sum of $5000, was made in August of the same year. The masters recommended the approval of both investments. Their recommendation was accepted by the circuit judge and a decree was accordingly entered.

The total of the notes authorized and issued by the pineapple company aggregated $5,000,000. They were denominated "debenture notes" and "gold notes" and were issued with elaborate formality. The fact is, however, that they were nothing more than evidence of the indebtedness of the maker to the holders and were unsecured by real estate mortgage or otherwise. The notes bore interest at the rate of five per cent per annum, payable semiannually, and became due April 1, 1936, with the option to redeem them at an earlier period if the maker so desired.

It is contended by the instant guardian that the decree of the judge was erroneous, primarily because the notes were unsecured and therefore the two investments referred to were, as a matter of law, improvident. This contention is met with the counter contention that under what is known as the Massachusetts rule, which the outgoing guardian claims has been adopted in Hawaii, the decree should be affirmed.

In *Harvard College* v. *Amory*, 9 Pick. 446 (decided in 1830), the rule now invoked is thus stated (p. 461) : "All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." In that case the crux of the controversy was whether the trustees had invested the funds of the trust with good security. The investment was in the stocks of certain trading corporations and it was contended that they should have been invested in public funds, bank stocks or in stocks other than those of trading corporations. The court said the answer was found in the authority which the testator gave to the trustees by which they were authorized to invest in stocks. It then said (p. 459) : "But it is argued that they did not invest in the public funds, bank shares or other stock, within the true intent and meaning of the authority, but in trading companies, and so exposed the capital to great loss." The court did not have before it the problem of whether the unauthorized investment by a trustee in corporate stocks was a prudent exercise of his fiduciary duty. The problem before it was whether trustees who were *expressly empowered to make such investments* had, in making them, exercised the judgment and discretion required by the law. It was in this connection that the court announced the general rule above quoted. Its conclusion upon the facts was thus stated (p. 463) : "It is proved or admitted that the stock which the trustees selected to constitute the trust fund of $50,000 was of that value when it was taken by them. We are of opinion that they had a right to select the stock

which they did for that purpose, and that they acted in the premises according to their best skill and discretion. And we have not seen any evidence which would satisfy us, that under all the circumstances of the case, they did not act with a sound discretion in making the selection and investment."

In *Lovell* v. *Minot,* 20 Pick. 116, the court was called upon to decide whether a loan of $3,700, made by a guardian, on the note of the borrower, payable in one year and *secured by five shares of the capital stock of a manufacturing company,* the par value of which was $1000 per share and the market value being above par, was a judicious investment. The court approved the investment and cited as authority *Harvard College* v. *Amory, supra.* The court naturally was silent as to what its conclusions would be if the note had been without security. It did, however, indicate some doubt about the soundness of the investment had it been made in the stock itself. Speaking on this point it said (p. 120) : "It was objected that this was an injudicious and indiscreet investment, because it exposed the funds to the risks and hazards of trade, and the rule was cited and relied on, that if a trustee puts the trust fund into trade, he shall account for the profit if any is made, and shall make good the capital, if any portion of it is lost. There would have been more ground for this argument had the money been invested in the manufacturing stock, in which case the profits would have been contingent. But it was not so; it was a loan at a fixed interest of six per cent, and the transaction no further exposed the capital to the hazards of trade than as it affected the value of the pledge. But at the rate at which these shares were taken as collateral security there was room for great fluctuation and they might fall twenty-five per cent without leaving the loan insecure."

In *Kimball* v. *Whitney*, 233 Mass. 321, the court applied the rule announced in *Harvard College* v. *Amory*, and supported an investment of trust funds made in the preferred shares of the Massachusetts Electric Companies, a Massachusetts trust. In speaking of what the trustee acquired by this investment, the court said (p. 329): "The facts now pertinent to the decision are that the Massachusetts Electric Companies was an unincorporated association organized and existing under a written instrument entitled 'Agreement and Declaration of Trust,' dated in June, 1899. The general features of this agreement were similar to those which have come before the court in numerous cases. Property is transferred to trustees, who hold the legal title to all the assets belonging to the trust and exercise the exclusive management and control of it under the terms of the agreement. Certificates of part ownership, resembling shares of stock in a corporation, are issued to those who are the ultimate owners of the property." What the court would have decided if the trustee had loaned the money to the Massachusetts Trust without security instead of purchasing an interest in its property is perhaps problematic.

In *In re Hunt*, 6 N. E. (Mass.) 554, the court quoted and applied the Massachusetts rule announced in *Harvard College* v. *Amory* in support of an unsecured investment of trust funds amounting to a little more than $2000 in a certificate of deposit issued by a solvent national bank and redeemable in about four and one-half months. In giving its reasons for its conclusion it said (p. 558): "Since savings banks might heretofore, and may still, invest their funds, to a limited amount, in the shares of such banks (Rev. St. c. 36, § 78; Gen. St. c. 57, § 142; Pub. St. c. 116, § 20; St. 1882, c. 224), the provision that deposits may be made on call does not imply that a loan of a moderate amount to a national bank for a short

term is supposed to be insecure. A legal debt due on demand, or within a short time, from a bank, may properly be considered as a security of a higher order than shares of its capital stock. There is nothing in all this legislation which calls upon us peremptorily to hold a trustee responsible for a loss incurred by reason of purchasing a certificate of deposit in a national bank, payable at a future time certain; but every such case, as it arises, must be determined on its own circumstances."

In *Clark* v. *Garfield*, 8 Allen 427, the Massachusetts court, after considering the rule laid down in *Harvard College* v. *Amory* and *Lovell* v. *Minot*, thought it insufficient to support a sale of a tract of land by a guardian who took in part payment the unsecured notes of "Platner & Smith, who were paper manufacturers in good credit and doing an extensive business." In its opinion the court said: "There is nothing in the facts agreed which leads us to doubt the good faith of the guardian in making the investment which has resulted in a loss to his ward's estate. Nor do we question the rule for which his counsel contends, that if a trustee acts with good faith and a sound discretion in the investment of trust funds, he is not to be held responsible for any loss which may happen. There is no other restriction, in this commonwealth, upon the kinds of investment which a trustee may make, than that which this rule implies. *Harvard College* v. *Amory*, 9 Pick. 446. *Lovell* v. *Minot*, 20 Pick. 116. But the facts show that the guardian invested a considerable sum belonging to his ward's estate in a note of his son, which he held, and which was wholly unsecured. In payment of this note he took the note of a manufacturing firm, who were at the time in perfectly good credit, but without taking any other security, not even the indorsement or guaranty of his son, from whom he received it. The question is, was this the exercise of

a sound discretion? We can have no doubt that it was not; and no case has been cited in which such an investment was ever sanctioned by a court. We think that to allow it would furnish a precedent of the most dangerous character, and would open a wide door to fraud. Such a note would not be taken by any bank of discount, much less by any savings bank; though the investments of savings banks, being regulated by statute, do not afford a precise standard of comparison. The transaction puts the property of the ward at the risk of the business of the partnership, without any corresponding chance of profit."

This case, so far as we know, has never been disturbed by the court from which it issued. It was cited with approval in *Corcoran* v. *Kostrometinoff,* 164 Fed. 685. In the *Corcoran* case the guardian had loaned $3,899.76 to the Northwest Loan & Trust Company, a banking institution at Portland, Oregon. The loan was evidenced by a time certificate payable in one year, and was without security. The bank subsequently went into liquidation and no more than ten per cent of the loan was ever recovered by the guardian. The court (pp. 687, 688) laid the following stricture upon the guardian's conduct: "While a mere error of judgment will not subject a guardian to personal liability for the loss of his ward's funds, he is, nevertheless, held to the exercise of prudence and sound discretion in investing the same, and it is uniformly held that, if he loan his ward's money without security, he assumes the entire risk no matter what may have been the credit of the borrower. Walker v. Walker, 42 Ga. 135; Clark v. Garfield, 8 Allen (Mass.) 427; Probate Judge v. Mathes, 60 N. H. 433; Wycoff v. Hulse, 32 N. J. Eq. 697; Lee v. Lee, 55 Ala. 590. * * * While a guardian is permitted to leave the funds of his ward temporarily on deposit in a reputable bank, pending in-

vestment or other disposition of the same, it is the decided weight of authority that he is personally chargeable with the loss of funds deposited with a bank for a fixed period of time upon a certificate of deposit. Such a transaction is a loan without security. * * * We can find no justification for the loan which was made by the guardian in the present case."

It is contended by the Trent Trust Company that we should not follow the rule declared in the *Corcoran* case for the reason that long before that case was decided (1908) the Massachusetts rule was by judicial decision adopted as the law in Hawaii and is therefore as binding on this court as though declared by statute. Unless it appears from our own cases that the Massachusetts rule has been employed to support investments similar to those now under consideration we think it cannot be said that we are at liberty to ignore the rule laid down by a court which is our immediate superior in jurisdiction. To do so would be a daring gesture.

This brings us to a consideration of the Hawaii cases. For the purpose of facilitating any subsequent study of the question now involved we shall review these cases with considerable particularity.

In *In re Estate of Banning*, 9 Haw. 453, the following facts appear: On November 3, 1886, W. F. Allen was appointed administrator of the Banning estate with the will annexed, the devisees being the widow, Clara H. Banning, and the son, Bernhardt Rudolph Banning. After the filing of his fifth account on January 10, 1893, the administrator was ordered discharged. On May 28, 1893, a petition was filed to vacate the order discharging the administrator, which petition was granted. Under the terms of the will the administrator was authorized to invest the funds committed to his care "in good securities with lower rates of interest in preference to high rates

with corresponding risks." The beneficiaries objected to certain investments made by the administrator. The supreme court surcharged Allen with three of these investments and approved the others. As disclosed by the record in that case, but not stated in the opinion, all the investments were secured. One of those surcharged was a loan to Fai Kee, the security being a mortgage on a leasehold interest in certain land. This interest was only *pour autre vie*, that is to say, it would terminate upon the death of a named third person. In disapproving this investment the court said (p. 461) : "Mr. Allen had a dual function to perform, one, as administrator, the other as trustee of the estate, the investment and management of which for the benefit of the legatees were confided to him. * * * The relations of Mr. Allen to the beneficiaries were such as to require him to act *cum uberrima fide.* The trustee was obliged to exercise that prudence which is used by men in the investment of their own funds, having regard not only to the interest to be made, but to the security of the principal and to the permanency of the investment. This is the doctrine stated by Mr. Justice Gray in the case of *Lamar vs. Micron,* 112 U. S. Rep., 468. Aside, however, from this eminent authority, the will in express terms directs the investment of the estate to be made in good securities, with lower rates of interest, in preference to high rates with corresponding risks. No statutory provision limiting the investment of trust funds to specific securities exists in the Hawaiian Islands, and this court cannot go further than to hold that the trustee must act with honesty, prudence, faithfulness, and exercise a sound discretion in placing trust funds for investment. To direct what securities and what only may be accepted by trustees, so that they would be exonerated in the event of loss, trenches upon legislative function. The discretion confided in such matters to the trustee is one that is

founded upon sound reasoning and conformity to established business principles, and the court can in no case hold a trustee blameless who has exercised his discretion otherwise. With a discretion so used, coupled with diligence and absolute good faith, the trustee is armed against liability for losses to which the most prudent investment may be subject." (*Harvard College* v. *Amory,* 9 Pick. 465; *Lovell* v. *Minot,* 20 Pick. 119; *Brown* v. *French,* 125 Mass. 415.) In subjecting the Fai Kee loan to the test of these rules the court said (p. 462) : "In lending the trust funds it was the duty of the trustee to ascertain the status of the mortgagor's leasehold interest, which was confessedly neglected, and, while in all probability no loss to the trust estate may grow out of it, the court must hold the trustee answerable for any loss which may arise from that investment."

The question we are considering is whether a loan of a large sum of money by a guardian to an industrial corporation without security is the exercise of a sound discretion. It is obvious that this question was not within the compass of the *Banning* case and therefore was not decided. In that case the question was whether a trustee, *empowered to invest the trust funds in good security,* had, in his choice of securities, used proper discretion as that term was defined in the opinion. As we have just seen, the court condemned the Fai Kee loan because it was insufficiently secured. *A fortiori* it would have condemned it if there had been no security. The other investments, which in the judgment of the court were safely secured, were approved.

In *Guardianship of Anna T. K. Parker,* 14 Haw. 347, an appeal was taken from the decree of the circuit judge surcharging the guardian with certain investments, those under consideration being as follows: Twenty-seven bonds of McBryde Sugar Company; four bonds of Waia-

lua Agricultural Company, and two bonds of the Oahu Railway & Land Company. The bonds in the first two investments were secured by first mortgage deeds of trust. It was admitted that the Oahu Railway & Land Company bonds were secured by a deed of trust similar in form to that securing the plantation bonds. This court approved the investment in the McBryde bonds except as to seven of them. For reasons which are immaterial to the present inquiry the investment in the seven bonds was disapproved. For reasons, also immaterial here, the court expressed no opinion as to the investment in the Waialua bonds.

The question presented for decision was whether an investment by a guardian of funds of his ward in the bonds of industrial corporations was proper where the bonds were secured by deeds of trust on all the corporate property. The court in its opinion said (pp. 350-352, 357, 358) : "It does not appear from any of the reported decisions of this court that the rule of the common law relied on has ever been adopted in these islands. It does appear that the rule has been specifically denied and that in a contested case the court refused to adopt or follow the rule, *In re Estate of Banning,* 9 Haw. 453, 461, 462, and announced the more liberal rule of a number of the states as follows, 'No statutory provision limiting the investment of trust funds to specific securities existed in the Hawaiian Islands, and this court cannot go further than to hold that the trustee must act with honesty, prudence, faithfulness, and exercise a sound discretion in placing trust funds for investment.' p. 462. * * * The rule in regard to the investment of trust funds as announced in the *Banning* case has been the law of this jurisdiction on that subject since the date of the decision (April 25th, 1894), and will continue such until overruled by this court or until a different rule is made by legisla-

tive enactment. Much unpleasant criticism has been made of the decision in the *Banning* case. We are inclined to think that the greater part at least of this is unwarranted. The doctrine there announced is not new nor is it novel. It has been the law in some of the states for half a century and has been approved by the Supreme Court of the United States. Mr. Justice Gray in speaking for that court said: 'The general rule is everywhere recognized, that a guardian or trustee, when investing property in his hands, is bound to act honestly and faithfully, and to exercise a sound discretion, such as men of ordinary prudence and intelligence use in their own affairs. In some jurisdictions no attempt has been made to establish a more definite rule; in others, the discretion has been confined, by the legislature or the courts, within strict limits.' *Lamar* v. *Micou*, 112 U. S. 452, 465. In this opinion the decisions of the supreme courts of the several states and the rule announced therein up to that date (1884) are reviewed. From this it appears that the rule announced in the *Banning* case is followed in Massachusetts, Rhode Island, New Hampshire, Vermont, Maryland and Georgia. We do not share the fear expressed by counsel for the dire disasters that are predicted to threaten wards and their estates unless the investment of their funds is restricted to public securities and real estate mortgages. The rule of the *Banning* case has been the law of this jurisdiction for at least eight years. The practical working of the rule for this period has not verified the predictions of evil made against its operation. If trust funds have been dissipated and lost by reason of this rule our notice has not been called to specific instances. In view of these facts and the absence of any government securities in this jurisdiction for the investment of trust funds and the general commercial, industrial and agricultural conditions prevailing here we do not

realize that there is any pressing necessity for a change of the rule. One of the investments approved in the *Banning* case was in bonds of the Kahuku plantation and another was in the bonds of the Oahu Railway and Land Company—the last being the same bonds that were disapproved by the court below in this case. * * * If the property covered by the trust deed is ample to secure the payment of the interest and principal of the bonds at maturity and is sufficient to commend them as safe investments to men of ordinary prudence and business judgment the guardian was justified in making the investment. * * * If the bonds of industrial corporations are excluded, the field for the investment of trust funds in this jurisdiction is limited to real estate mortgages. There are no government or municipal bonds available within this Territory. If the question presented was one of 'first impressions' this reason would, perhaps, appeal more strongly to the legislature than to the courts but the question in the case at bar is of changing a rule adopted after careful consideration and in operation for years without known disastrous effects and we consider this fact entitled to consideration. On the question of the sufficiency of the security for the McBryde bonds. We will state without going into detail that we consider the evidence was ample to show that the property conveyed by the trust deed is sufficient security for the 750 bonds issued and the interest thereon."

Again, the instant question lies beyond the horizon of the decided case. There the loans were secured and, as the court thought, amply so. Here the loans are not secured at all. The controlling fact which the court had in mind clearly appears from the following clause of its opinion, which, for the purpose of emphasis, we repeat (p. 357) : "If the property covered by the trust deed is ample to secure the payment of the interest and principal

of the bonds at maturity and is sufficient to commend them as safe investments to men of ordinary prudence and business judgment the guardian was justified in making the investment."

In *Estate of Thomas Cummins*, 16 Haw. 185, the trustee by the will was given among other properties twenty shares of stock of the Wailuku Sugar Company with the power to control and manage the trust estate and to "invest and keep invested all money and stock and use or dispose of the same and all other personal property and invest the proceeds as he shall deem best to carry out the trust herein declared." After the death of the testator, through a change in the par value of the stock from $500 to $100 per share, the trustee received one hundred shares for the original twenty. Later the company issued new shares, giving stockholders the right to purchase their pro rata number of these shares. The trustee was entitled to forty of these new shares but instead of exercising this right the trustee's agent assigned it to the life beneficiary who bought and sold the forty shares, making a profit of $2000. The court surcharged this amount against the trustee for releasing a valuable right without receiving pecuniary consideration for the trust estate.

This case is cited by the Trent Trust Company as authority for the proposition that a trustee may properly invest the trust funds in the common stock of an industrial corporation. The case is insufficient for this purpose. By the terms of the trust the trustee was given sufficiently broad powers to include such investment. Moreover, the trustee did not invest in the stock of the Wailuku Sugar Company but surrendered a right which he had to make such investment to the detriment of the estate. It was for this that he was surcharged.

In *Brown* v. *Brown*, 22 Haw. 715, Maria King by her

will had named A. M. Brown as trustee. The trustee held parcels of land on Molokai, with power to sell and reinvest the proceeds and to pay the net rents, income and profits to the testatrix's daughter, Sarah E. Brown. The trustee was directed upon Sarah's death, to convey the trust property to her children, Kenneth and Alice Brown and Gertrude Brown Humphries. The trust property was reasonably worth $20,000 and was valuable only for grazing purposes. Sarah owned land in the same vicinity in her own right. She desired to purchase the trust property for $20,000 so as to combine the whole into a cattle ranch. She therefore proposed to do this in the following manner. She would take over the trust lands at $20,000 and borrow $30,000 additional, giving as security for the latter amount a first mortgage on the Molokai lands which she originally owned and on the land acquired from the trustee and also on certain property she owned at Waikiki. She would then give the trustee a second mortgage on all the property included in the first mortgage to secure the amount of $20,000 she would owe for the trust land. This proposal was not satisfactory to the trustee and was, at his suggestion, modified as follows: Sarah E. Brown would pay in cash the purchase price of the trust property, except $13,300, which amount she would secure by a second mortgage on all the property included in the first mortgage and would also pay off a mortgage indebtedness on the trust property of $6,589. Upon the advice of counsel that there was some doubt about his power to take a second mortgage in payment for the purchase price of the lands the trustee refused to proceed further. The matter was then submitted to this court on the agreed facts. The court approved the modified agreement and ordered the trustee to execute it. The following portions of the opinion are significant (p. 717): "The general question presented

for consideration is as to when, if at all, may a trustee invest trust funds upon a second mortgage upon real estate. In this jurisdiction the rule as to the investment of trust funds is that the trustee must act with honesty, prudence and faithfulness, and exercise such sound discretion as prudent business men exercise in the investment of their own moneys, having regard not only to the income, but to the security of the principal and to the permanency of the investment. *In re Estate of Banning,* 9 Haw. 453; *In re Guardianship of Parker,* 14 Haw. 347; *Estate of Cummins,* 16 Haw. 185. The application of this rule to an investment of trust funds in a second mortgage upon real estate, assuming the existence of the requisite honesty and good faith, would involve the question whether, under all the circumstances, it could be regarded as a sound and prudent business transaction. This, in the absence of statute or special direction, is the ultimate test as to the making of any investment by a trustee, and it is obvious that under some circumstances a second mortgage might offer a safer and better investment than, under other circumstances, a first mortgage would provide." Again (p. 719): "The two principal matters ordinarily to be considered with reference to the safety and soundness of an investment of this kind are, (1) the value of the security, and (2) the ability of the trustee to protect the investment in the event of the foreclosure of the senior mortgage."

The question under consideration was whether the proposed investment would be sufficiently secured to meet the requirements of the rule that the trustee must "exercise such sound discretion as prudent business men exercise in the investment of their own moneys, having regard not only to the income, but to the security of the principal and to the permanency of the investment." The court said in the concluding paragraph of its opinion

(p. 720) : "After careful consideration, though with some hesitation, we have reached the conclusion that the proposed transaction is a prudent one for the trustee to effect under the circumstances stated, and that there is no lack of power on his part to make the investment in question. And as the supposed want of power is the only ground upon which the trustee has based his refusal to perform his agreement, a decree requiring him to perform it may be entered." It is clear enough from the hesitancy with which the court reached its conclusion that if its opinion had been sought on whether the trustee had the power to make the investment without any security its answer would have been in the negative.

It is apparent from our review of the decisions of this court that they do not require us to approve unsecured loans made to an industrial corporation, even conceding the solvency of the borrower and the approbation of the investments by men of reputed discretion and prudence. The adoption of a rule requiring the approval of such investments would be to substitute for the measured judgment of courts of equity the uncharted opinion of persons who, however wise and careful in their own investments, are nevertheless not charged with the responsibility of protecting trust funds against dissipation and loss.

As we have seen, the Massachusetts court in *Clark* v. *Garfield, supra,* did not consider that the rule laid down in *Harvard College* v. *Amory* and *Lovell* v. *Minot, supra,* required approval of a sale of trust property in payment of which the trustee took the unsecured notes of an industrial partnership in good standing, and disapproved the transaction. The ninth circuit court of appeals, in *Corcoran* v. *Kostrometinoff, supra,* also condemned an unsecured loan of trust funds to a bank. The rule under which the *Clark* and *Corcoran* cases were decided is thus

stated in 65 C. J. 803, § 682: "As a general rule, in the absence of express authority in the instrument creating the trust, a trustee should not make any loan or investment of trust funds on personal security. The fact that the loan was to a person concededly solvent is immaterial. This is particularly true where such an investment is made in direct violation of the requirements of the trust instrument; and, even when the investment is left to the discretion of the trustee, it is not a sound discretion to invest in such securities." Following this rule, it is said in *Michigan Home Missionary Society* v. *Corning,* 164 Mich. 395, 402, that "It is general doctrine, accepted everywhere, that a trustee must show the utmost good faith. He must exercise in the execution of the trust the degree of care and diligence which a man of ordinary prudence would exercise in the management of his own affairs. In respect to the investment of trust funds, in the absence of express directions from the settlor and of statute directions, courts have not infrequently been called upon to determine whether particular investments evidenced the exercise by the trustee of ordinary prudence. However conflicting in some respects the decisions may appear to be, in one respect they are reasonably uniform. It is a generally accepted rule that it is not prudent to invest trust funds in unsecured notes of an individual or of a partnership. We have found no decision which announces a contrary rule where the trust contemplated an investment of a permanent nature. This rule condemns the defendant trustees, and, if applied, obliges them to account to the *cestui que trust* for the fund."

It will be observed that the court while recognizing the Massachusetts rule that a trustee must exercise the same degree of care and diligence that a man of ordinary prudence would exercise in the management of his own affairs held, as a matter of law, that it was not prudent

to invest trust funds in the unsecured notes of an individual or partnership. In 17 A. & E. Ency. L. (2 ed.) 435, 436, the author makes the following observations regarding trust investments: "In all cases where a fiduciary has discretionary powers to exercise, it is required that in selecting and managing his investments he shall act in perfect good faith, for what he believes to be the best interests of the owner of the real interest in the fund with which he is intrusted, and exercise sound business judgment and proper care and diligence, with a view to the security of the fund rather than the making of a large profit. * * * It naturally follows that unsecured loans are always improper, even though the borrower is apparently perfectly solvent and able to pay, or has promised to give security in the future." See also 1 Perry on Trusts (7 ed.), § 453.

Instead of being a hindrance to the disapproval of the investments now under consideration we think the rule laid down by our own cases and elsewhere requires it. One of the essentials of the rule is that investments by fiduciaries shall be made *with due regard to the security of the principal.* The loans to the Hawaiian Pineapple Company were made without any security. The notes themselves were of course not security but mere promises to pay. We think it was error not to surcharge the outgoing guardian with these loans.

The next assignment of error relates to an investment of $9,245, made by the guardian in the notes of the California Packing Corporation, a New York corporation. These notes, like those of the Hawaiian Pineapple Company, were without security. What we have said concerning the pineapple company investment therefore applies with equal force to that made in the notes of the packing company. They are likewise condemned and the guardian should be surcharged with the amount of the loan.

The last assignment of error concerns the decree of the circuit judge charging the ward's estate with the masters' fees, the expenses incident to the masters' hearings and the fee of the retiring guardian's attorneys. These items were fixed by the circuit judge at $8,263.62 and $1500 respectively. The reasonableness of these amounts is not questioned.

It is contended by the incumbent guardian that this portion of the decree was erroneous for the reason that "all the work done and all the expense incurred" in connection with the masters' hearings "resulted solely and entirely from the petition of Trent Trust Company for leave to resign" and therefore the cost should be borne by that company. In considering this contention it must be kept in mind that the petition of the Trent Trust Company to resign was not prompted by a desire to abandon its office but was induced by its having, for reasons foreign to its fiduciary position, been placed in the hands of a receiver.

What would be the liability of a guardian who merely to serve his own ends seeks to be relieved of his fiduciary duties or whose resignation is compelled by malfeasance we need not determine. It may be under such circumstances that a court of equity would consider that the investigation of the guardian's account was made necessary by his own fault and therefore the cost should be charged against him. This question is not before us and is not decided.

The case before us is quite different. The Trent company was not at fault in asking to resign its office but did so for a valid reason. Therefore an examination and approval of its account were not made a condition precedent to granting its request. The request was promptly granted and a new guardian appointed. Five days thereafter an order for the investigation of its

account by designated masters was made. Under these circumstances we think the Trent company should be treated, so far as its liability for the fees of the masters and the expense incident to their hearings is concerned, in the same manner as any other fiduciary whose honesty and good faith are conceded but who for good cause asks to resign his office and submits his account to judicial scrutiny. There are no inflexible rules by which this question must be determined. Each case should be decided on its own facts.

When the account of the retiring guardian was referred to the masters they were ordered "to examine and report on the final account, filed March 17, 1932, by the guardian herein." This necessitated an investigation not only of the investments that were challenged by the successor guardian but of all other matters which pertained to the retiring guardian's administration of the minor's estate. The report of the masters shows that the investigation was thorough and comprehensive, including not only the investments, which were numerous, but the collection of large income due from many sources and the guardian's disbursements. In the performance of their duties the masters were the representatives of the court whose function it was to ascertain whether the guardian had discharged its trust with prudence and fidelity. Their investigation was therefore in the interest of and for the protection of the minor's estate. We think it is equitable and just that the estate should bear the cost of the investigation.

The fee of the Trent Trust Company's counsel stands on a somewhat different footing. The exceptions of the incumbent guardian to various items in the account made it necessary for the Trent Trust Company to employ counsel to defend itself against these attacks. If it had been found blameless as to any of the items we would

think it unjust and inequitable to require it to pay any part of the expense to which it had been put in procuring counsel to act in its behalf. If on the other hand it had been found culpable as to all the challenged items it would seem just and equitable that it should bear the burden of its counsel fees. The instant case lies between the two extremes. The Trent Trust Company, as we have seen, was not at fault as to some of the items but was at fault as to others. We think therefore, under these circumstances, that the counsel fee in question should be apportioned equally between the parties.

A decree in conformity with this opinion will be signed upon presentation.

*Robertson & Castle* for A. W. Carter.

*Smith, Warren, Stanley & Vitousek* and *Prosser, Anderson, Marx & Wrenn* for Trent Trust Co. and Cooke Trust Co.

### OPINION OF PERRY, C. J., CONCURRING IN PART AND DISSENTING IN PART.

On the subject of the masters' fees and expenses and of the fees of the retiring guardian's attorneys, I am unable to concur.

As shown by the masters' report, the inventory book value of the ward's estate at the time of the resignation of the retiring guardian and the appointment of a successor was $1,012,769.73. The retiring guardian had been under a bond of $1,000,000. As was their duty under the order of the trial court, the masters examined all of the investments made by the retiring guardian as well as all of the statements of income received and of expenditures made. The face value of the securities attacked by the incoming guardian was only $145,745 and of this latter sum only $84,245 has been surcharged by this court to the retiring guardian. The time and the efforts devoted

by the masters to the case were caused in part only by the errors of the retiring guardian in the making of investments and in large part by the examination into investments which were not attacked by any one and into investments which, although attacked, have been sustained by this court.

The resignation of the Trent Trust Company was prepared by the attorney of the incoming guardian. The accounts of the retiring guardian and its resignation were prepared and filed without the aid of any attorney employed by the retiring guardian. It was only after the new guardian had been appointed and an attack had been made by him upon some of the investments of the retiring guardian that the latter employed the attorneys whose compensation of $1500 is now one of the items in question. At this stage of the case the contest became one between the incoming guardian and the retiring guardian. The Trent Trust Company in its employment of counsel from that time on was seeking, not to protect the estate of the ward, but to protect itself from surcharges sought to be made against it. The employment of the retiring guardian's attorneys was not for the purpose of aiding the masters in their investigation, although undoubtedly it did operate incidentally by way of assisting the masters to a correct conclusion.

Under all of these circumstances an apportionment of the fees (both of the masters and of the attorneys) and other expenses incident to the hearing before the masters and the determination by them is required in order to treat both the ward's estate and the retiring guardian equitably; but as there is no inflexible rule relating to fees and other incidental expenses applicable alike to all cases of examination into the investments made by a guardian, so, also, it is impossible in the case at bar to apportion such fees and expenses with mathe-

matical accuracy. The best that a court can do is to make an approximation in the way of such an apportionment. In this case an adjudication that the ward's estate shall bear all of the masters' fees and expenses and that the retiring guardian shall pay the fees of its own attorneys is as close an approximation to doing justice to the parties concerned as to me seems possible.

In all other respects I concur in the opinion of the majority.